**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **GARRY BOYD, BOYD MEDICAL INC.,** | ) |
| **CHARLES WETHERILL, and** | ) |
| **ADDISON MEDICAL, INC.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **vs.** | ) **Case No. 07-cv-0751-MJR** |
| | ) |
| **TORNIER, INC., and** | ) |
| **NEXA ORTHOPEDICS, INC.,** | ) |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM AND ORDER

**REAGAN, District Judge:**

### A.  Background and Introduction

Currently before the Court is Tornier's motion for summary judgment as to Boyd

Medical and Garry Boyd (Doc. 98).  Plaintiffs Boyd Medical and Addison Medical are distributors,[1]

each of which contracted with Tornier to sell Tornier's orthopedic medical devices in certain regions

of the United States.  In 2003, the parties entered into separate contracts through which Boyd

Medical became Tornier's exclusive distributor in Illinois, Missouri, and Kansas, and Addison

Medical became Tornier's exclusive distributor in Iowa.[2]  The agreement provided that it would last

one year, and that either party could terminate the agreement at the end of the term by giving 30-

days notice.  If neither party terminated it by this method, the agreement would automatically renew

---

[1]  Plaintiffs Boyd and Wetherill are employees of Boyd Medical and Addison Medical, respectively.

[2]  Boyd Medical's Agency Agreement with Tornier was effective as of March 13, 2003 (Doc. 95-2, Exh. A, p. 6).  Addison Medical's Agency Agreement was effective as of June 2, 2003 (Doc. 95-2, Exh. C, p. 44).

for successive one-year terms. However, Tornier claims that it also had the right to terminate the agreement upon written notice at the end of any quarter in which a distributor failed to reach the projected sales quota, as set by Tornier.

In fact, Tornier terminated its agreements with Boyd Medical and Addison Medical in May 2007, on the grounds that each had failed to meet its first quarter quota that year. In 2007, Tornier also purchased Nexa Orthopedics, which develops and manufactures orthopedic devices. Tornier opted to use Nexa's distributors after terminating its agreements with Boyd Medical and Addison Medical.

On October 31, 2007, Plaintiffs filed this lawsuit against Tornier alleging Breach of Contract (Counts 1 and 5), Fraud in the Inducement (Counts 2 and 6), and Negligent Misrepresentation (Counts 3 and 7). Plaintiffs also sued Nexa for Tortious Interference with a Business Relationship (Counts 4 and 8).[3]

Tornier moved for summary judgment against Garry Boyd and Boyd Medical on March 9, 2009 (Doc. 98). Plaintiffs submitted a response on April 3, 2009 (Doc. 108), and Tornier submitted a reply on April 10, 2009 (Doc. 110). Having fully reviewed the parties' filings, the Court hereby **GRANTS IN PART AND DENIES IN PART** Tornier's motion for summary judgment (Doc. 98).

### B. Factual Background

Boyd Medical signed an Agency Agreement with Tornier on March 13, 2003, which granted Boyd Medical an exclusive distributorship to sell its products in the territory assigned to Boyd Medical (Doc. 95-2). Initially, this territory was made up of various counties in Missouri and

---

[3] Defendants Archway Medical, Inc. and James O'Day were voluntarily dismissed without prejudice on November 7, 2008 (Doc. 73).

Illinois, but later came to include Kansas as well. The Agreement provided two separate methods of termination. First, either party could terminate the Agreement "as of the end of the term upon not less than thirty (30) days prior written notice" (Doc. 95-2, Exh. A, ¶ 9.1). However, Section 9.3 of the Agreement also stated that Tornier "shall have the right to terminate this Agreement upon written notice to the Agency following the close of any quarter in which the projected minimum sales have not been attained by the Agent" (Doc. 95-2, Exh. A, ¶ 9.3). Despite this provision, the Tornier Agency Manual, which is expressly incorporated into the Agency Agreement (*see* Doc. 95-2, Exh. A, ¶ 1.6), states:

> Sales performance for any given quarter that is more than 25% behind quota may result in immediate termination of the Agency Agreement.
>
> When sales performance is less than 25% behind quota, the following steps may be initiated:
>
>> • First Warning – this is a verbal warning that requires the Agent to improve performance and achieve quota levels within 30 to 60 days as specified by TORNIER, Inc.
>>
>> • Second Warning – this is a written communication between the Agent and TORNIER and it requries the Agent to meet quarterly sales objectives (quota) within 30 to 60 days as specified by TORNIER, Inc.
>>
>> • Performance Improvement Plan or Written Probation – this is a written set of requirements that must be attained (including but not limited to attainment of quota) for the Agency Agreement to remain in effect.
>>
>> • Termination – may occur when performance is not improved following the implementation of the three actions described immediately above (Doc. 95-2, Exh. B, p. 6).

Boyd Medical met all its yearly quotas through the end of 2006, and the Agency Agreement was renewed each year. During that period, it appears that Boyd Medical only missed

a quarterly quota three times: fourth quarter 2005, first quarter 2006, and third quarter 2006. However, Boyd Medical was already ahead of pace for its yearly quota in each of these instances, except after the first quarter of 2006 when Boyd Medical only missed quota by approximately $560 (Doc. 64-6, App. 112).

During this period, Boyd Medical claims that Tornier's representatives indicated that if Boyd Medical made certain changes to its business model, Tornier would continue to renew Boyd Medical's distributorship from year to year. Specifically, Boyd Medical claims that it was continually asked to hire additional employees and avoid selling products from other lines so that Boyd Medical could concentrate on promoting Tornier's products. Boyd Medical claims that it did in fact hire additional employees and focused on selling Tornier's products. However, Tornier claims that it only informed its distributors that this was its preference and never promised any distributor, including Boyd Medical, that it would remain a Tornier distributor if it complied (Doc. 108-4, App. 117, Carrow Depo., pp. 49–50).

At the beginning of 2007, Boyd Medical received its quotas from Tornier. Boyd Medical's 2007 quota included a 56% increase over its 2006 quota (Doc. 108-4, App. 138, Boyd Depo., p. 59). Additionally, the monthly quotas were heavily increased towards the beginning of the year (*Id.*). The first quarter quota also included some products which Boyd Medical claims were not yet available or else had only limited availability (Doc. 108-4, App. 134, Boyd Depo., p. 45), though Tornier claims that all products were available for sale in 2007 (Doc. 108-2, App. 18–19, Sherburn Depo., pp. 190–96). Boyd Medical expressed its concerns about its ability to meet quota to Tornier, but Tornier refused to alter the quota (Doc. 108-4, App. 137–138, Boyd Depo., pp. 57–58).

At the end of the first quarter in 2007, Boyd Medical failed to meet its quota of

$451,346 and sold only $379,147, which is approximately 84% of the quota (Doc. 64-6, App. 112).

At some point in March 2007, Tornier decided to terminate Boyd Medical as a distributor and replace it with Archway Medical (Doc. 108-2, App. 23, Sherburn Depo., pp. 210–212). The termination of Boyd Medical's distributorship was confirmed by letter dated May 14, 2007, and became effective May 31, 2007 (Doc. 64-7, App. 189). Archway began work as a Tornier distributor in Boyd Medical's territory in June 2007 (Doc. 98-7, App. 569, O'Day Depo., p. 192).

## C. Legal Standards Governing Summary Judgment Motions

Summary judgment is appropriate when there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. ***Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)**. **FEDERAL RULE OF CIVIL PROCEDURE 56(a)** provides:

> [Summary judgment] should be rendered if the pleadings, the discovery and disclosure materials on file and any affidavits show that there is no genuine issue as to any material fact that the movant is entitled to as a matter of law.

Because the primary purpose of summary judgment is to isolate and dispose of factually unsupported claims, the non-movant may not rest on the pleadings but must respond, with affidavits or otherwise, setting forth specific facts showing that there is a genuine issue for trial. ***Oest v. IDOC*, 240 F.3d 605, 610 (7th Cir. 2001); *Moore v. J.B. Hunt Transport, Inc.*, 221 F.3d 944, 950 (7th Cir. 2000).** The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." ***Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).**

The burden is on the non-moving party to produce specific facts that show a genuine issue for trial. **FED.R.CIV.P. 56(e); *Moore*, 221 F.3d at 950.** "Conclusory allegations and self-serving affidavits, if not supported by the record, will not preclude summary judgment." ***Haywood***

*v. North American Van Lines, Inc.*, 121 F.3d 1066, 1071 (7th Cir. 1997); *see also* FED.R.CIV.P. 56(e) (**"an opposing party may not rely merely on allegations or denials in its own pleading"**).

In determining whether a genuine issue of material fact exists, the Court views the record in the light most favorable to—and draws all reasonable inferences in favor of—the non-moving party. *Anderson*, **477 U.S. at 255.**

## D. Boyd Medical's Breach of Contract Claims

### 1. Governing Law

As a federal court exercising diversity jurisdiction, this Court applies federal law in resolving procedural and evidentiary issues, and Illinois law with respect to substantive law. *Bevolo v. Carter*, **447 F.3d 979, 982 (7th Cir. 2006) (citing** *Colip v. Clare*, **26 F.3d 712, 714 (7th Cir. 1994)).** As such, this Court applies Illinois's choice-of-law rules to determine the applicable substantive law. *See Hinc v. Lime-O-Sol Company*, **382 F.3d 716, 719 (7th Cir. 2004);** *Kohler v. Leslie Hindman, Inc.*, **80 F.3d 1181, 1184 (7th Cir. 1996)**. Illinois follows the RESTATEMENT (SECOND) OF CONFLICT OF LAWS in making such decisions. *Midwest Grain Products of Illinois, Inc. v. Productization, Inc.*, **228 F.3d 784, 787 (7th Cir. 2000)**.

For contracts claims, the Restatement and Illinois law respect a contract's choice-of-law clause as long as the contract is valid. *Kohler*, **80 F.3d at 1185.** In this case, the parties' contract includes a choice-of-law provision, which provides that the contracts "shall be construed and determined in accordance with the laws of the State of Texas." **Doc. 95-2, ¶ 10.12; Doc. 28-3.** As the parties do not contest the contracts' validity, the Court applies Texas law to Plaintiffs' breach of contract claims.

### 2. Termination of the Agency Agreement

It is well-settled under Texas law that the elements necessary to prove a claim for breach of contract are (1) the existence of a valid contract, (2) plaintiff's performance or tendered performance of the contract, (3) defendant's breach of the contract, and (4) plaintiff's damages. *Lopez v. M.G. Bldg. Materials, Ltd.*, -- S.W.3d --, 2009 WL 1546145, *4 (Tex. App. June 3, 2009).

In Count 1, Boyd Medical and Garry Boyd claim that Tornier breached its Agreement by engaging in a wide variety of conduct, including setting unattainable quotas for the first quarter of 2007, developing these quotas without proper consideration of the Agency Manual's guidelines, failing to make adequate efforts to support Boyd Medical's sales efforts, terminating Boyd Medical's distributorship without implementing a Performance Improvement Plan, appointing another distributor in Boyd Medical's territory prior to the termination of Boyd Medical's exclusive distributorship, and terminating Boyd Medical for reasons other than its failure to meet its first quarter quota.[4] Tornier argues that all of Boyd Medical's breach of contract claims fail as a matter of law.

### a. Tornier's Motivation for Terminating Boyd Medical

The Court begins with Boyd Medical's various claims that Tornier breached contract for terminating its distributorship for reasons other than its failure to meet quota. For instance, Boyd Medical claims it was terminated because it did not have a separate office or a specific number of salespeople. This claim misses the point. Boyd Medical's breach of contract claim depends on whether or not Tornier had the right to terminate its distributorship. Tornier concedes that the only

---

[4] The complaint also includes an allegation that Tornier failed to pay commissions and compensation for returned samples. However, the parties' filings indicate that while this may have been at issue earlier in the litigation, the parties have resolved any dispute as to outstanding commissions and reimbursements. As a result, the Court need not address this issue further.

valid basis it may have had to terminate the distributorship is Boyd Medical's undisputed failure to meet its first quarter quota in 2007. If Tornier had the right to terminate the Agreement at the end of that quarter, then there was no breach, regardless of whether Tornier may have had other reasons for the termination. Accordingly, Boyd Medical's breach of contract claims must be dismissed insofar as they rely on Tornier's ulterior motives for termination.

### b.  Interpreting the Contract's Termination Provisions

This brings the Court to the question of whether Tornier did in fact have the right to terminate Boyd Medical's distributorship due to its failure to meet quota. Boyd Medical claims that it could not be terminated without warning because it was within 75% of its first quarter quota. In making this claim, Boyd Medical argues that the inclusion of both Section 9.3 in the Agency Agreement and competing provisions in the Agency Manual create an ambiguity resulting in a fact question for the jury.

As noted above, Section 9.3 states that Tornier "shall have the right to terminate this Agreement . . . following the close any quarter in which the projected minimum sales have not been attained by the Agent" (Doc. 95-2, Exh. A, p. 4, ¶ 9.3). However, the Agency Agreement expressly incorporates the Agency Manual (*see* Doc. 95-2, Exh. A, ¶ 1.6) and provides that an agent's failure to come within 25% of quota "may result in immediate termination" (Doc. 95-2, Exh. B, p. 6). It goes on to state that where an agent is less than 25% under quota for a particular quota, certain other steps short of termination "may be initiated" (Doc. 95-2, Exh. B, p. 6).

The question is whether the Agency Manual's demarcation of a 25% threshold creates a safe haven within which Tornier must first give warnings so that an Agent can get back on track before terminating that Agent. Under Texas law, the Court may only find a contract's provisions ambiguous if it is susceptible to more than one reasonable interpretation. ***Frost Nat'l***

***Bank v. L&F Distributors***, 165 S.W.3d 310, 311 (Tex. 2005). Additionally, the Court must "consider the entire writing and attempt to harmonize and give effect to all the provisions of the contract by analyzing the provisions with reference to the whole agreement." ***Id.*** However, the Court "should not strain to find ambiguity in a contract if such an exercise would defeat the parties' probable intent." ***In re Credit Suisse First Boston Mortgage Capital, LLC***, 257 S.W.3d 486, 490 (Tex. App. 2008).

Using these rules of construction, the Court finds that the contract's provisions are in fact ambiguous. At first glance, it would appear that the language of Section 9.3 provides Tornier with a right to terminate its distributors anytime they fail to meet a quarterly quota, regardless of how close that distributor may have been to its goal. However, when construing that provision alongside the Agency Manual, the waters are considerably muddied. One plausible interpretation of the Agency Manual is that Tornier merely reserved the right to take less drastic steps than termination where distributors were within 25% of their quarterly quota. In other words, the Agency Manual simply informs Tornier's agents that even though they can be terminated in such circumstances, Tornier may, in its discretion, implement a less severe approach to give them time to catch up. After all, the Agency Manual does say that Tornier "may" implement certain steps short of termination, not that it must.

But if that is the case, then why even mention that termination "may" occur when a distributor is more than 25% behind quota? If Section 9.3 already provides that Tornier has a right of termination *any* time a distributor fails to meet a quarterly quota, then the Agency Manual's provision regarding those distributors who are more than 25% behind quota is entirely superfluous. An alternate interpretation of the Agency Manual is that while Tornier has a right of termination in such circumstances, that right will not be exercised when a distributor is less than 25% behind quota

without first undertaking some remedial measures to improve their performance. This does not

negate Section 9.3, because the Agency Manual still permits termination of a distributor who is less

than 25% behind quota if performance does not improve. Under this interpretation, the use of the

permissive language "may" simply indicates that Tornier is not limited to the remedial measures

listed in the Agency Manual, but could take other unlisted steps short of termination as well.

Thus, the Court finds that the parties' contract is susceptible to two different

reasonable constructions with regard to the termination of an agent who fails to meet a quarterly

quota. This creates a fact question, and a jury must determine the parties' intent. And because the

parties agree that Boyd Medical was within 25% of its first quarter quota in 2007, the breach of

contract claim cannot be dismissed on this particular ground.

### c. Waiver

But Boyd Medical goes further, arguing that even if the contract gave Tornier the

right to terminate when a distributor failed to meet its quota, Tornier waived that right by not

terminating Boyd Medical on the three prior occasions that it missed quota. The Court rejects this

argument and finds no genuine issue of material fact with respect to this question. Tornier did not

waive any termination rights it had under the Agreement.

The contract itself provides: "The failure of either party to enforce at any time any

of the provisions hereof shall not be a waiver of that party's right thereafter to enforce any such

provision of the Agreement" (Doc. 95-2, ¶ 10.3). This clause was renewed each year along with the

contract, including in January 2007. The presence of this clause, and its renewal without alteration,

strongly indicates that Tornier did not intend to waive any right to terminate it may have had under

the contract.

Moreover, "[w]aiver is largely a matter of intent. For implied waiver to be found

through a party's actions, intent must be clearly demonstrated by the surrounding facts and circumstances." *Southwest Grain Co. v. Garza*, **2007 WL 1087179, \*8 (Tex. App. April 12, 2007).** And while waiver usually presents a question of fact, "when the facts and circumstances are undisputed, the question becomes one of law." *Id.* Here, the undisputed facts create a question of law. While it is true that Boyd Medical did miss its quarterly quota on three occasions prior to 2007, Boyd Medical was already ahead of pace for the annual quota two out of those three times. The only other instance was the first quarter of 2006, when Boyd Medical only missed its quota of $292,963 by $560 (Doc. 64-6, App. 112). In other words, Boyd Medical was only 0.2% behind quota at that point. These circumstances cannot be reasonably construed as a manifest intent by Tornier to waive any termination rights it may have had under the Agreement. Section 9.3 focuses on meeting quota, and in each of the situations where Boyd claims Tornier waived its right to terminate, Boyd was essentially on track to meet its annual quota.

That no waiver occurred is also evident because the record clearly shows that Tornier repeatedly expressed its concern to Boyd Medical in 2007 that it was substantially behind its first quarter quota. Such conduct is inconsistent with any waiver of the provision in question. Having considered all of the relevant circumstances, the Court finds that Tornier did not waive any rights it had under Section 9.3. Boyd Medical has failed to meet its burden of showing that a genuine issue of material fact exists with respect to the question of waiver.

### d.  Attainability of Quotas

Next, the Court addresses Boyd Medical's allegation that Tornier set unreasonable and unattainable quotas . Tornier argues that this is not a valid basis for a breach of contract claim, because the contract does not explicitly require Tornier to set "attainable" or "reasonable" quotas. Boyd Medical on the other hand, appears to argue that these terms are implied by the Agency

Agreement. Because Boyd Medical raises a number of issues regarding the attainability of Tornier's 2007 quotas, the Court will address each in turn.

The Agency Agreement provides that Tornier "shall determine projected sales and shall communicate that information to the Agent for the initial calendar year" (Doc. 95-2, Exh. A, ¶ 9.2). Those sales are also to be taken into account each year that the contract is renewed. Though Tornier clearly had discretion in calculating annual quotas, the Agency Manual provided that yearly quotas would be "based on demographics, sales history and market potential" (Doc. 95-2, Exh. B, p. 5). Boyd Medical claims that it is unaware of the particular calculations Tornier made to arrive at its 2007 quota, but that in any event, the first quarter quota was unattainable.

As an initial matter, the Court addresses Boyd Medical's argument that the contract contained an implied term requiring that any quota would be "reasonable" and "attainable." The law on this issue is clear:

> Implied covenants are not favored in Texas law. Thus, it is only in rare circumstances that a court will imply a covenant in a contract. A term will not be implied simply to make a contract "fair, wise, or just." A court will only look beyond the written agreement to imply a covenant if necessary to effectuate the parties' intent as disclosed by the contract as a whole.

***Gamma Group, Inc. v. Transatlantic Reinsurance Co.*, 242 S.W.3d 203, 212–13 (Tex. App.-Dallas 2007) (internal citations omitted).** The Court sees no reason to imply a term of "reasonability" or "attainability" into the parties' contract here, because the parties specifically included particular guidelines for the calculation of quotas. The parties obviously intended that the quotas would be calculated pursuant to those factors, and this Court will not disturb the parties' clear intent.

However, this does not mean that the calculation of Boyd Medical's 2007 quarterly

quotas is irrelevant. The thrust of Boyd Medical's claim with respect to this issue is clear—it claims that Tornier purposely set unreasonably high first quarter quotas so as to thwart Boyd Medical's ability to maintain its distributorship. In other words, Boyd Medical's claim is that Tornier caused the contract to fail by setting unattainable quotas, which in turn caused the condition necessary to terminate the contract (i.e., Boyd Medical's failure to meet its first quarter quota).

Under Tornier's reading of the contract, a distributor cannot be terminated mid-contract, so long as it satisfies the condition of meeting its quarterly quotas. If Boyd Medical can show that Tornier set unattainable quotas so as to prevent Boyd from satisfying the condition, however, Boyd Medical may state a valid breach of contract claim. ***See Dorsett v. Cross*, 106 S.W.3d 213, 217 (Tex. App. 2003); Restatement (First) of Contracts § 295.**

The Court finds that a genuine issue of material fact exists as to this issue. First, Boyd Medical offers expert testimony that a 20% increase in quota is standard in the industry and that business in the orthopedic medical sales industry tends to be lower at the beginning of the calendar year. Garry Boyd also indicates that the first quarter quota was unattainable, especially since Tornier front loaded its January and February quotas to a nearly 70% increase (Doc. 108-4, App. 138, Boyd Depo., pp. 59–60). And while Tornier points to other evidence in the record to indicate that Boyd's sales in previous years were strong in January and February, there is clearly an issue of fact here for the jury. The testimony offered by Boyd Medical could convince a jury that Tornier's decision to give Boyd Medical a 56% increase in quota was unreasonable, and that such conduct prevented Boyd Medical from meeting its quota, thereby subjecting it to termination.

Also, Boyd Medical presents evidence claiming that its first quarter quota was unreasonable because it was required to sell products that were either unavailable or else had limited availability. These products were the Salto Talaris ankle, the humeral plate, and the resurfacing

head.  Tornier claims that these items were available, and its various distributors sold them during the first quarter of 2007 (Doc. 98-4, Sherburn Declaration; Doc. 98-3, Lamendola Declaration). However, Boyd Medical claims that it was unable to obtain these products during the first quarter of 2007 (Doc. 108-4, App. 134, Boyd Depo., p. 45).  Additionally, James O'Day, an employee with Archway—Boyd's replacement—stated that the humeral plate was only available if customers asked for it (Doc. 98-7, App. 239, O'Day Depo., p. 191).  Sherburn also indicated that the humeral plate was available on a "limited basis" and that there were limitations on the resurfacing head as well (Doc. 108-2, App. 18, Sherburn Depo., pp. 190–92).

With respect to the ankle, it appears that a distributor was not permitted to sell it unless the physician purchasing it had been trained on it.  There were three training sessions held in 2006, which none of Boyd's customers attended (Doc. 108-2, App. 18–19, Sherburn Depo., pp. 192–95).  Another training session was scheduled for January 2007, but it filled up and Boyd did not sign up any physicians for that training (Doc. 79-3, App. 65).  However, when Tornier calculated Boyd's totals at the end of 2006, it did not consider the fact that Boyd would not have been able to sell the ankle in the first quarter given its failure to send any physicians to training (Doc. 108-2, App. 19, Sherburn Depo., pp. 195–96).  And while the inability to sell these products was not the sole reason that Boyd Medical failed to meet its quota, the potential lack of availability of certain items included in that quota would go to the issue of whether Tornier purposely set unreasonable quotas.  Though it appears that the products in question were available to some extent, there is sufficient evidence that a jury could find that the limited availability of these items made the quota intentionally unreasonable.  Thus, the Court finds that there is a genuine issue of material fact as to this issue.

Boyd Medical also argues that the quotas were unreasonable because Tornier failed

to consider all of the factors identified in the Agency Manual—"demographics, sales history and market potential" (Doc. 95-2, Exh. B, p. 5). The record is not fully developed on this issue, and it is not clear whether Tornier did in fact consider all of the factors identified in the Agency Manual. For instance, Greg Sherburn, Tornier's Vice President of Sales, stated that he primarily considered Boyd's sales from the previous year and also accounted for any price increases as to Tornier's products (Doc. 108-2, App. 17, Sherburn Depo., pp. 177–180). He failed to mention any consideration of demographics or market potential, however. Because the record is not clear on this point, a genuine issue of material fact remains and summary judgment cannot be granted.

### e. Whether Tornier Adequately Supported Boyd Medical

Next, Tornier argues that the Court should dismiss the portion of Boyd Medical's breach of contract claim that alleges Tornier failed to make "every effort" to support Boyd Medical's 2007 sales. This claim is based on a statement in the Agency Manual under the heading "Sales Meetings" that "TORNIER, Inc. makes every effort to support national, regional and local sales efforts" (Doc. 95-2, Exh. B, p. 22). However, what constitutes "every effort" is clarified immediately thereafter:

> National and regional meetings will be arranged by TORNIER, Inc. personnel.
>
> Requests for local meeting support should be addressed with your Sales Manager.
>
> Any commitments and/or obligations made by the Agent or their representative on behalf of TORNIER, Inc. will be the responsibility of the Agency unless pre-approved by TORNIER, Inc. (Doc. 95-2, Exh. B, p. 22).

Obviously, there is an inherent ambiguity in the term "every effort." Reading the contract as a whole, the Court cannot construe this provision to mean that Tornier must do everything that its

distributors ask it to do, but rather that Tornier would undertake reasonable efforts to support its distributors' sales.

It should be clear from the Court's earlier analysis that a genuine issue of material fact exists as to whether Tornier did in fact undertake reasonable efforts to support Boyd Medical's efforts. Again, certain products in Boyd's quota may have been available only on a limited basis. And with respect to the Salto Talaris ankle, Boyd argues that he was not given sufficient time to sign physicians up for training after learning that the ankle was a component of his first quarter quota. Tornier makes much of the fact that Boyd Medical could have sent doctors to training sessions in 2006, but it appears that these items were not part of Boyd Medical's quota at the time, and once they were, the only training session may have been full, possibly giving Boyd Medical little to no chance of selling the ankle during that short time frame.

Boyd Medical also argues that despite its inability to meet Tornier's high quota, Tornier failed to give Boyd adequate suggestions or opportunities to catch up. In support of this position, Boyd Medical offers Garry Boyd's testimony regarding the scant feedback provided by Tornier during the first quarter (*see* Doc. 108-4, App. 137, Boyd Depo., pp. 57–58; Doc. 108-6, App. 236). Because a genuine issue of material fact exists as to whether Tornier used adequate efforts to support Boyd Medical, the Court cannot grant summary judgment as to this issue.

### f.  Breach of Exclusivity Clause

Finally, the Court addresses Boyd Medical's claim that Tornier breached the exclusivity clause by appointing Archway as its distributor in Illinois, Missouri, and Kansas before Boyd Medical's contract had been terminated. This claim is wholly unsupported by the evidence in the record. It is undisputed that Boyd Medical's Agreement with Tornier was terminated in May 2007. Jim O'Day testified that Archway did not begin  work as a Tornier distributor until June 2007

-16-

(Doc. 98-7, App. 569, O'Day Depo., p. 192).   Boyd offers nothing to rebut this statement.

Accordingly, there is no evidence to support the claim that Tornier permitted the two distributors

to overlap prior to June 2007.  Because no genuine issue of material fact exists, this aspect of Boyd

Medical's breach of contract claim must be dismissed.[5]

> In summary, the Court **GRANTS** the motion for summary judgment as to Plaintiffs'

breach of contract claims (1) that Tornier terminated its distributorship for motives other than Boyd

Medical's failure to meet its quota and (2) that Tornier breached the exclusivity clause of the

Agreement.  Additionally, the Courts finds that Tornier has not waived any of its termination rights

under the Agreement.  The Court **DENIES** Tornier's motion for summary judgment on Plaintiffs'

breach of contract claims in all other respects.

## E.  Plaintiffs' Tort Claims

### 1.  Governing Law

> The Court now turns to Tornier's motion for summary judgment as to Garry Boyd

and Boyd Medical's tort claims.  As noted above, this Court applies Illinois's choice-of-law rules

to determine the applicable substantive law.  In determining which state's law applies to Plaintiffs'

tort claims against Tornier, the Court   "select[s] the law of the jurisdiction that has the 'most

significant relationship' to the events out of which the suit arose, and to the parties."  ***Carris v.***

***Marriott International Inc.*, 466 F.3d 558, 560 (7th Cir. 2006) (citing *Esser v. McIntyre*, 661**

**N.E.2d 1138, 1141 (Ill. 1996)).**  The law of the place where the injury occurred is presumed to apply

---

[5] In its motion, Tornier also includes a footnote suggesting that Garry Boyd's breach of contract claim should be dismissed due to his lack of privity with Tornier.  However, this undeveloped argument will not be addressed by the Court because it is not accompanied by any legal discussion or citation to the record.  However, after sufficient development, the Court will entertain any well-taken motion at the Rule 50 stage.

unless another state has a more significant relationship to the occurrence or parties. ***Pittway Corp. v. Lockheed Aircraft Corp.*, 641 F.2d 524, 527 (7th Cir. 1981); *see Spinozzi v. ITT Sheraton Corp.*, 174 F.3d 842, 844 (7th Cir. 1999).** In determining whether another state has a more significant relationship to the occurrence or parties, the Court may also consider (1) the place where the injury causing conduct occurred, (2) the domicile of the parties, and (3) the place where the relationship of the parties is centered. ***Pittway Corp.*, 641 F.2d at 527.**

The place of the injury as to Plaintiffs' tort claims is Missouri, as Boyd is domiciled there and Boyd Medical's distributorship was centered there. Additionally, Missouri was a central component of Body Medical's sales territory. Accordingly, the Court applies Missouri law to Plaintiffs' tort claims.

## 2. Alleged Misrepresentations

Plaintiffs' tort claims against Tornier (Counts 2 and 3) are fraudulent misrepresentation and negligent misrepresentation. Under Missouri law, a fraudulent misrepresentation claim requires a plaintiff to establish the following elements:

> (1) a false, material representation; (2) the speaker's knowledge of the falsity of the representation, or ignorance of its truth; (3) the speaker's intent that the hearer act upon the misrepresentation in a manner reasonably contemplated; (4) the hearer's ignorance of the falsity of the misrepresentation; (5) the hearer's reliance on the truth of the representation; (6) the hearer's right to rely thereon; and (7) the hearer's consequent and proximately caused damage.

***Dancin Development, L.L.C. v. NRT Missourti, Inc.*, -- S.W.3d --, 2009 WL 1120315, \*3 (Mo. App. 2009).** Additionally, "[m]ere statements of opinion, expectations, and predictions for the future are insufficient to authorize a recovery for fraudulent misrepresentation." ***Id.* (quoting *Trotter's Corp. v. Ringleader Restaurants, Inc.*, 929 S.W.2d 935 (Mo. App. 1996)).**

To raise an actionable claim for negligent misrepresentation under Missouri law, a

claimant must show that

> (1) the speaker supplied information in the course of his or her business because of some pecuniary interest; (2) due to the speaker's failure to exercise reasonable care or competence in obtaining or communicating this information, the information was false; (3) the speaker intentionally provided information for the guidance of a limited group of persons in a particular business transaction; (4) the listener justifiably relied on the information; and (5) as a result of the listener's reliance on the statement, the listener suffered a pecuniary loss.

*M & H Enterprises v. Tri-State Delta Chemicals, Inc.*, 35 S.W.3d 899, 904 (Mo. App. 2001).

Boyd Medical claims that Tornier made the following material misrepresentations:

a. That Boyd Medical's relationship with Tornier would continue for three to five years;

b. That Tornier would provide everything Boyd needed to succeed and meet its quotas;

c. That Boyd "was doing a great job and that Boyd Medical was the ideal Tornier distributorship";

d. That Boyd should not acquire non-competing lines because Tornier would eventually fill any voids in the product line;

e. That if Boyd continued to hire additional employees, Tornier would continue to renew Boyd's exclusive distributorship;

f. That Boyd Medical had "nothing to worry about" even though it was behind quota in January 2007;

g. That Boyd Medical would receive the Nexa and DVO product lines to make up for the large 2007 quotas;

h. That quotas would be set at attainable levels; and

i. That Tornier would support Boyd Medical's sales efforts by making new products, marketing materials, and training opportunities available on a timely basis.

Because of the large number of alleged misrepresentations, the Court addresses each separately.

First, there is no evidence to support Boyd's claim that Tornier represented that Boyd Medical would remain a distributor for three to five more years. When asked whether he believed Tornier promised that Boyd Medical would remain a distributor for any particular period of time, Boyd answered:

A.  **I thought we had a year-to-year promise**, but I thought, yes. They talked about growth and hiring new salesmen for the future. Rick Carrow always talked about, you know, three years down the line, five years down the line.  I think that's how I came up with five years.

Q.  Okay.  And let me just ask you expressly.  I think you've answered it, but did anybody at Tornier ever say to you, Garry, we're going to keep you on for another whatever the period is, another three years, another five years?
. . .
A.  It was **inferred** when Jim Hook stood up and said you're doing a great job.  It was **inferred** when Greg Sherburn told Doug Kohrs that we were an ideal distributor.

Q.  Okay.  And when you say inferred, that's—

A.  **Assume** that we would be going forth for a number of years.

**Doc. 108-4, App. 144–45, Boyd Depo., pp. 89–90 (emphasis added).**  Boyd's testimony clearly indicates that he made assumptions based on certain statements made by Tornier staff.  But ultimately, he believed the relationship was year-to-year and no one ever made any promise to him that it would continue beyond that.  Certainly, one can understand why Tornier would make long range plans with its distributors in the hope that profitable relationships would continue.  But such statements do not constitute misrepresentations, especially when Boyd himself admits that he extrapolated his own assumptions and inferences from Tornier's statements.  Additionally, the fact that the contract was renewed for only one year at a time establishes that any reliance on the implication that the distributorship would be retained for three to five years was unjustified.  The contract clearly provided that it would last only one year, and that it could be terminated at the end of that term, or else renewed.  There was no guarantee of renewal, however.  Boyd has failed to establish that a genuine issue of material fact exists to show that Tornier made this particular misrepresentation or that Boyd justifiably relied on the statement.

Next, Tornier argues that Greg Sherburn's 2006 statement that Boyd was doing a great job and Boyd Medical was the "ideal distributorship" must be dismissed. The Court agrees. This statement is clearly an opinion and cannot be deemed material. Despite Boyd Medical's roundabout argument to the contrary, there is nothing to support the contention that Greg Sherburn did not in fact hold a high opinion of Boyd Medical at that time. At that point, the evidence indicates that Boyd Medical had maintained its quota, or else was ahead of yearly quota when Boyd Medical missed a quarterly quota. The mere fact that the Agreement was terminated approximately 9 months later does not establish a genuine issue of material fact that Sherburn was lying when he gave his opinion. In any case, it is not clear what reliance Sherburn could have intended, nor is there any indication that Boyd Medical did rely on the statement. Thus, this particular claim of misrepresentation must be dismissed.

Additionally, Tornier claims that Boyd Medical cannot establish any instance before 2007 when Tornier instructed Boyd not to acquire non-competing product lines on the basis that Tornier would fill any voids in the product line. The Court finds that there is a genuine issue of material fact with respect to this issue, however. It is undisputed that Tornier encouraged its distributors not to carry other product lines (Doc. 108-4, App. 120, Carrow Depo., p. 69). Furthermore, Boyd indicates that he was regularly asked to either eliminate or avoid other product lines (*see* Doc. 108-4, Boyd Depo., pp. 14-15, 17, 24-25, 114-16). Boyd also states that he was made to believe that a distributor who did not do so risked non-renewal of their Agreement. The fact that Boyd does not identify specific dates and times when such representations were made is beside the point, because his testimony indicates that Boyd Medical was regularly informed that it should focus on Tornier and not carry other lines. Likewise, Tornier's argument that Boyd cannot show reliance since he did not identify any particular line he would have acquired is unconvincing.

The testimony suggests that Boyd was constantly under the assumption that any such acquisition would hurt his standing with Tornier, so he did not bother to investigate other lines. In essence, his claim is that Tornier's representations led him to rely on continued business such that he did not seek out other lines, which might have served as a safety net in the event of Boyd Medical's termination. Accordingly, the Court finds that a genuine issue of material fact exists with respect to this particular representation.

Tornier next attacks Boyd Medical's claim that in November 2006, Tornier represented that Boyd Medical would keep its exclusive distributorship if Boyd Medical continued to hire new employees. It is undisputed, however, that Boyd had not hired any new employees between November 2006 and its termination. Additionally, any reliance on such a statement would have been unjustified because when the Agreement was renewed in January 2007, it contained the same termination provisions: either party could terminate the Agreement at the end of the contract term upon thirty days written notice for any reason whatsoever, and Tornier could terminate Boyd Medical if it failed to meet quarterly quotas.[6] As a matter of law, Boyd could not reasonably rely on a statement that is superseded by a written integrated agreement. In light of the express terms of the one-year Agreement permitting termination under various circumstances, Boyd Medical cannot have reasonably relied on any prior statement by Tornier that it would remain an exclusive distributor if it merely hired more employees. Consequently, Boyd has not carried his burden of establishing that a genuine issue of material fact exists with respect to this particular representation.

Tornier also seeks dismissal of Boyd Medical's misrepresentation claims regarding the alleged statement that Tornier would set attainable quotas. The Court agrees that this claim must

---

[6] However, the Court has already explained that the exact nature of this right remains in dispute.

-22-

also be dismissed. When specifically asked whether Tornier ever told him that its quotas would be attainable, Boyd admitted that no such representation had explicitly been made (Doc. 64-8, App. 349, Boyd Depo., p. 96). There is nothing in the record to indicate that Tornier ever actually made such a representation. Rather, Boyd argues that the Court should read an implied term into the contract requiring that quotas be attainable. But the Court has already refused to do so. The attainability of quotas is relevant to the contract claim insofar as Tornier may have intended to prevent Boyd Medical from remaining in good standing. However, without an actual representation that quotas would be attainable, Boyd has no action in tort as to that issue.[7]

Finally, the Court turns to the alleged misrepresentations that Tornier would provide everything that Boyd needed to succeed, that Nexa and DVO lines would be offered to make up for the larger quota, and that Tornier would make new products, marketing materials, and training opportunities available. These representations are not actionable because the record indicates that they were made only after the 2007 Agreement went into effect. Consequently, Boyd cannot and does not provide any evidence indicating that he actually relied on these statements. For instance, Boyd Medical does not claim that it relaxed in its attempts to sell Tornier products due to the false hope that help would be forthcoming. By all indications, Boyd tried to make its first quarter quota, but failed. Nor does Boyd Medical claim that it delayed performance while waiting for Tornier to provide new products and marketing materials. In short, there is nothing in the record to suggest that Boyd justifiably relied on this alleged misrepresentation. As no genuine issue of material fact

---

[7] Boyd Medical cites the Court's prior order on Tornier's motion to dismiss pursuant to Rule 12(b)(6). There, the Court refused to dismiss this particular misrepresentation claim because the alleged statement "could plausibly have led to Boyd Medical's reasonable reliance, in that it believed continued renewal of the agreement offered a level of risk that justified expected rewards" (Doc. 91, p. 18). At that stage, however, the Court accepted the allegations in the complaint as true (i.e., that the representation had in fact been made). Boyd Medical must now come forward with evidence to support its claims. It has failed to do so.

exists with respect to this issue, the Court must dismiss these particular misrepresentation claims.

Accordingly, the Court **GRANTS** summary judgment in favor of Tornier as to all of Plaintiffs' fraudulent and negligent misrepresentation claims, ***except*** Plaintiffs' claim regarding Tornier's alleged statement that Boyd should not acquire other product lines because Tornier would fill any product line voids.

### F.  Plaintiffs' Damages

Finally, Tornier argues that even if Boyd Medical and Boyd prevail on their claims, they have no compensable damages.  First, Tornier argues that Plaintiffs cannot collect lost profits because the Agency Agreement expressly prohibits their recovery.  Obviously, this argument only pertains to Plaintiffs' damages for the breach of contract claim, as the provisions of the contract have no effect on recoverable damages for any independent tort.  As a result, the Court's analysis begins by focusing on Plaintiffs' recoverable damages for their breach of contract claim.

The Agency Agreement provides: "Upon termination of this Agreement, neither party shall be liable to the other for any loss of profits of any kind or nature sustained or arising out of such termination" (Doc. 95-2, Exh. A, ¶ 9.6).  The Court noted in its previous order that under Texas law, limitation of liability clauses are generally enforceable, so long as they are not contrary to public policy. *Head v. U.S. Inspect DFW, Inc.*, **159 S.W.3d 731, 748 (Tex. App. 2005)**.  The Court of Appeals of Texas has explained that this inquiry is fact-based.

> In determining whether a limitation of liability clause is unconscionable or against public policy, courts generally consider the entire atmosphere in which the agreement was made, the bargaining process the parties went through, and whether there is such a disparity in bargaining power between the parties that one party is forced to agree to the exculpatory provision.

*Mireles v. Tejas Appraisal & Inspection Co.*, **2007 WL 1826074, \*1 (Tex. App. June 27, 2007)**

**(citing** *Head***, 159 S.W.3d at 748;** *Pony Express Courier Corp. v. Morris***, 921 S.W.2d 817, 821 (Tex. App. 1996)).** However, the mere existence of unequal bargaining power alone is not sufficient to defeat a limitation of liability provision, as it is the unfair use of that power that undermines the contract. *Grewal v. Hickenbottom***, 2003 WL 22295373, \*4 (Tex. App. Oct. 8, 2003) (quoting** *Holeman v. Nat'l Bus. Inst. Inc.***, 94 S.W.3d 91, 99 (Tex. App. 2001)).**

The Court finds that a fact question exists as to whether the limitation of liability clause is enforceable here. Boyd Medical has presented substantial evidence that each time the contract was renewed, Tornier did not negotiate and dictated the terms of the agreement. With each successive renewal, Boyd Medical claims it was pressured to drop other product lines and focus solely on Tornier, such that by 2007, the loss of Tornier was catastrophic to its business. Boyd Medical also presents evidence that Tornier unfairly used its stronger bargaining position to place Boyd Medical in a position where it completely depended on Tornier's business. Thereafter, Boyd Medical claims that Tornier used this bargaining position to require Boyd Medical to accept unattainable quotas. Boyd Medical further presents evidence to support its claim that the 2007 quotas were orchestrated to cause it to miss its first quarter quota so that Tornier could terminate the agreement. The crux of Boyd Medical's breach of contract claim is that Tornier used its superior position to set Boyd Medical up for failure. The Court has already set out the facts underlying this claim in detail. Accordingly, a fact question exists as to whether Tornier unfairly used its stronger bargaining position in such a way as to undermine the contract. Thus, Boyd Medical may have a claim for lost profits directly resulting from the alleged breach of contract.

Nonetheless, the Court agrees that any lost profits arising from Tornier's breach of contract must be limited to the remaining term of the contract: June 1, 2007 through December 31,

2007. Boyd Medical offers no legitimate reason to extend the recovery of such damages through five years. The Court previously explained that there is no evidence in the record to support the allegation that Tornier ever promised that Boyd Medical would remain a distributor for five years. On the other hand, it is undisputed that Tornier would have been permitted to terminate the Agreement at the end of 2007, so long as it gave proper notice. As such, the evidence in the case only supports breach of contract damages through the remainder of the contract term.

Next, the Court turns to the issue of damages under Plaintiffs' tort claim. Boyd seeks the recovery of various expenses incurred during its relationship with Tornier. Many of the damages sought are clearly unavailable because, with the dismissal of Boyd Medical's various tort claims, Boyd Medical can not show causation for the particular expenses it asks Tornier to pay. For instance, Boyd Medical seeks the recovery of expenses incurred from hiring additional employees. But the Court has dismissed Boyd Medical's misrepresentation claim insofar as it depends on an allegation that Tornier induced it to hire additional employees.[8] Such expenses are not causally related to any of Boyd Medical's other tort claims.

In fact, the only remaining tort claims pertain to Tornier's alleged misrepresentation that Boyd should not acquire non-competing product lines because Tornier would fill any voids in the product line. According to Boyd Medical, by focusing its efforts on Tornier, it believed it would receive continued business such that it would not need to rely on other product lines. The Court has already explained that fact questions remain as to the viability of this claim. If Boyd Medical can prove a case of misrepresentation, it may be able to present a claim for damages related to any expenses it incurred in either giving up non-competing lines or not pursuing alternate product lines.

---

[8] Irrespective of the fact that it appears that Boyd's employees were paid commissions only, which would indicate that Boyd did not incur additional expenses with respect to salaries after termination (Doc. 98-7, App. 558, Boyd Depo., p. 109).

However, the Court notes that Boyd Medical will have to establish its actual damages, which may be difficult based on the current record.

None of the other requested expenses are causally related to the remaining misrepresentation claim. Accordingly, Boyd Medical cannot recover damages related to the hiring of new employees, ordering marketing instruments and literature, or devoting its resources to the Tornier line (which is itself required by the contract and non-compensable).

Finally, Tornier argues that punitive damages are not available to Boyd Medical because it is unable to show that Tornier acted with legal malice with regard to the remaining tort claim. Under Missouri law, "a plaintiff makes a submissible case for punitive damages when he presents clear and convincing evidence from which a reasonable jury could conclude that the defendant had an evil motive." *Horizon Memorial Group, LLC v. Bailey*, **280 S.W.3d 657, 663 (Mo. App. 2009).** However, "a plaintiff cannot submit a punitive damage claim solely on the basis that he established that the defendant committed an intentional tort." *Id.*

The record before the Court makes it difficult to determine whether Boyd Medical will be able to present sufficient evidence to support a finding of malice. But the totality of the evidence surrounding Tornier's conduct could potentially convince a reasonable juror that Tornier sought to make Boyd Medical dependent on its product line, without any regard for the effect that this could have on Boyd Medical's viability once Tornier terminated the distributorship. As a result, the Court declines to dismiss Plaintiffs' claims for punitive damages at this time. However, the Court emphasizes that this is a close call, and it may be an issue for resolution at the Rule 50 stage.

Thus, the Court **GRANTS** Tornier's motion for summary judgment insofar as it dismisses all of Plaintiffs' claims for damages stemming from expenses incurred in hiring new employees, ordering marketing instruments and literature, or devoting its resources to selling Tornier

products.  The Court **DENIES** Tornier's motion for summary judgment as to Plaintiffs' claims for damages in all other respects.

## G.  Conclusion

Accordingly, the Court hereby **GRANTS IN PART AND DENIES IN PART** Tornier's motion for summary judgment as to Boyd Medical and Garry Body (Doc. 98).  In summary, the Court **GRANTS** summary judgment in favor of Tornier insofar as it **DISMISSES** Plaintiffs' breach of contract claims for lack of any genuine issue of material fact (1) that Tornier terminated its distributorship for motives other than Boyd Medical's failure to meet its quota and (2) that Tornier breached the exclusivity clause of the Agreement.  Additionally, the Courts **FINDS** that Tornier has not waived any of its termination rights under the Agreement.

The Court also **DISMISSES** all of Plaintiffs' fraudulent and negligent misrepresentation claims, ***except*** Plaintiffs' claim regarding Tornier's alleged statement that Boyd should not acquire other product lines because Tornier would fill any product line voids.

Finally, the Court **GRANTS** Tornier's motion for summary judgment insofar as it **DISMISSES** all of Plaintiffs' claims for damages stemming from expenses incurred in hiring new employees, ordering marketing instruments and literature, or devoting its resources to selling Tornier products.  The Court **DENIES** Tornier's motion for summary judgment in all other respects.

Plaintiffs' remaining breach of contract claims stem from its allegations (1) that Tornier intentionally established unattainable quotas so as to cause Boyd Medical to miss its first quarter quota in 2007 and thereby subject Boyd Medical to termination, (2) that Tornier included products in Boyd Medical's first quarter quota that had only limited availability, (3) that Tornier set 2007 quotas without adequately considering certain factors as required by the Agency Manual, (4) that Tornier failed to make reasonable efforts to support Boyd Medical's first quarter sales efforts

in 2007, and (5) that Tornier terminated Boyd without providing any warnings or implementing a Performance Improvement Plan in contravention of the Agency Manual.

Plaintiffs' only remaining tort claims are that Tornier fraudulently misrepresented, or, alternatively, negligently misrepresented that Boyd Medical should avoid other product lines and instead focus solely on selling Tornier products so as to maintain a continued business relationship with Tornier.

**IT IS SO ORDERED.**

**DATED this 12th day of June 2009.**

**s/ Michael J. Reagan**
**MICHAEL J. REAGAN**
**United States District Judge**
