# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| GARY BOYD, BOYD MEDICAL INC., CHARLES WETHERILL, and ADDISON MEDICAL, INC., | ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) Case No. 07-cv-0751-MJR ) |
| TORNIER, INC., and NEXA ORTHOPEDICS, INC., | ) ) ) ) |
| Defendants. | ) |

## ORDER AND MEMORANDUM

**REAGAN, District Judge:**

### A. Introduction and Background

Currently before the Court is Nexa Orthopedics's motion for summary judgment (Doc. 100). The general factual background is as follows. Plaintiffs Boyd Medical and Addison Medical are distributors,[1] which contracted with Tornier to sell Tornier's orthopedic medical devices in certain regions of the United States. In 2003, the parties entered into separate contracts through which Boyd Medical became Tornier's exclusive distributor in Illinois, Missouri, and Kansas, and Addison Medical became Tornier's exclusive distributor in Iowa.[2]

Like Tornier, Nexa Orthopedics was also in the business of developing, manufacturing, and marketing orthopedic medical devices. On February 12, 2007, Tornier's parent

---

[1] Plaintiffs Garry Boyd and Charles Wetherill are employees of Boyd Medical and Addison Medical, respectively.

[2] Boyd Medical's Agency Agreement with Tornier was effective as of March 13, 2003 (Doc. 95-2, Exh. A, p. 6). Addison Medical's Agency Agreement was effective as of June 2, 2003 (Doc. 95-2, Exh. C, p. 44).

-1-

company purchased Nexa with the intention of merging Nexa into Tornier. At that time, Tornier began investigating how it would handle the presence of Nexa distributors in territories where Tornier already had exclusive distributors. Tornier executives conducted meetings with Chris Harber, who was at that time Nexa's Vice President of Marketing and Sales. Harber was asked to give his impressions of Nexa's distributors to facilitate Tornier's decisions as to which distributors to keep in the merger. Harber recommended that all Nexa distributors be retained and advocated on their behalf. At some point thereafter, Tornier interviewed various Nexa distributors including Archway Medical.

Ultimately, Tornier decided that some Nexa distributors would continue to sell only Nexa products in the same region where Tornier distributors sold Tornier products. In other regions, the Tornier distributor absorbed all of the Nexa business and the Nexa distributors were eliminated. With respect to the territory in which Boyd Medical and Addison Medical operated, Tornier opted to give its business to a Nexa distributor—Archway Medical. Thus, in April 2007, Tornier notified Plaintiffs that it planned to terminate its Agency Agreements with each of them. In May 2007, Tornier confirmed this termination in writing, effective May 31, 2007. Tornier claims that it acted within its rights because each Plaintiff failed to meet its first quarter quota that year.[3] As of June 2007, Archway Medical became Tornier's and Nexa's exclusive distributorship in the Boyd Medical and Addison Medical territories.

On October 31, 2007, Plaintiffs filed the above-captioned action. In addition to their claims against Tornier, Plaintiffs claim that Nexa tortiously interfered with their business

---

[3] Tornier claims that Section 9.3 of the Agency Agreements gave it the right to terminate the relationship upon written notice at the end of any quarter in which a distributor failed to reach the projected sales quota, as set by Tornier.

relationship as to Tornier (Counts 4 and 8).[4] Nexa filed its motion for summary judgment on March 9, 2009 (Doc. 100). Having fully reviewed the parties' filings, the Court hereby **GRANTS** Nexa's motion.

### B. Standards Governing Motions for Summary Judgment

Summary judgment is appropriate when there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. ***Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)**. **FEDERAL RULE OF CIVIL PROCEDURE 56(a)** provides:

> [Summary judgment] should be rendered if the pleadings, the discovery and disclosure materials on file and any affidavits show that there is no genuine issue as to any material fact that the movant is entitled to as a matter of law.

Because the primary purpose of summary judgment is to isolate and dispose of factually unsupported claims, the non-movant may not rest on the pleadings but must respond, with affidavits or otherwise, setting forth specific facts showing that there is a genuine issue for trial. ***Oest v. IDOC*, 240 F.3d 605, 610 (7th Cir. 2001);** ***Moore v. J.B. Hunt Transport, Inc.*, 221 F.3d 944, 950 (7th Cir. 2000).** The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." ***Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).**

The burden is on the non-moving party to produce specific facts that show a genuine issue for trial. **FED.R.CIV.P. 56(e);** ***Moore*, 221 F.3d at 950.** "Conclusory allegations and self-serving affidavits, if not supported by the record, will not preclude summary judgment." ***Haywood v. North American Van Lines, Inc.*, 121 F.3d 1066, 1071 (7th Cir. 1997);** *see also* **FED.R.CIV.P.**

---

[4] Defendants Archway Medical, Inc. and James O'Day were also named as Defendants, but Plaintiffs voluntarily dismissed them without prejudice on November 7, 2008 (Doc. 73).

**56(e) ("an opposing party may not rely merely on allegations or denials in its own pleading")**.

In determining whether a genuine issue of material fact exists, the Court views the record in the light most favorable to—and draws all reasonable inferences in favor of—the non-moving party. ***Anderson*, 477 U.S. at 255.**

### C. Analysis

**1. Governing Law**

The first issue before the Court is which state's law should apply to the Plaintiffs' individual tort claims. Nexa claims that Texas law should apply, because most of the tortious conduct occurred there. Plaintiffs, on the other hand, argue that the state law of their respective domiciles should apply. That is, Missouri law should apply to Boyd Medical's and Garry Boyd's claims and Iowa law should apply to Addison Medical's and Charles Wetherill's claims.[5]

As a federal court exercising diversity jurisdiction, this Court applies federal law in resolving procedural and evidentiary issues, and Illinois law with respect to substantive law. ***Bevolo v. Carter*, 447 F.3d 979, 982 (7th Cir. 2006) (citing *Colip v. Clare*, 26 F.3d 712, 714 (7th Cir. 1994)).** As such, this Court applies Illinois's choice-of-law rules to determine the applicable substantive law. ***See Hinc v. Lime-O-Sol Company*, 382 F.3d 716, 719 (7th Cir. 2004); *Kohler v. Leslie Hindman, Inc.*, 80 F.3d 1181, 1184 (7th Cir. 1996)**. Illinois follows the **RESTATEMENT (SECOND) OF CONFLICT OF LAWS** in making such decisions. ***Midwest Grain Products of Illinois, Inc. v. Productization, Inc.*, 228 F.3d 784, 787 (7th Cir. 2000)**.

In determining which state's law applies to Plaintiffs' tort claims against Nexa, the

---

[5] If the Court recalls correctly, this is an about-face for all of the parties. In their motions to dismiss, Nexa's analysis applied Missouri and Iowa law, whereas Plaintiffs claimed that Texas law applies. The Court opted to apply Missouri and Iowa based on the allegations in the pleadings (Doc. 92).

Court "select[s] the law of the jurisdiction that has the 'most significant relationship' to the events out of which the suit arose, and to the parties." *Carris v. Marriott International Inc.*, **466 F.3d 558, 560 (7th Cir. 2006) (citing *Esser v. McIntyre*, 661 N.E.2d 1138, 1141 (Ill. 1996))**. The law of the place where the injury occurred is presumed to apply unless another state has a more significant relationship to the occurrence or parties. *Pittway Corp. v. Lockheed Aircraft Corp.*, **641 F.2d 524, 527 (7th Cir. 1981);** *see Spinozzi v. ITT Sheraton Corp.*, **174 F.3d 842, 844 (7th Cir. 1999)**. In determining whether another state has a more significant relationship to the occurrence or parties, the Court may also consider (1) the place where the injury causing conduct occurred, (2) the domicile of the parties, and (3) the place where the relationship of the parties is centered. *Pittway Corp.*, **641 F.2d at 527.**

The situs of Plaintiffs' injuries from the alleged tortious interference is the same as the domicile of each Plaintiff. Indeed, Plaintiffs' businesses are located in these states and their operations were run there. Furthermore, Addison Medical's exclusive distributorship only serviced Iowa counties. The Plaintiffs' domicile states can also be thought of as the center of the parties' relationships. The only factor weighing in Texas's favor is that many of Nexa's discussions with Tornier regarding the benefits of making Archway Medical an exclusive Tornier distributor occurred in Texas. However, that factor alone is not sufficient to overcome other considerations.

The Court determines that Missouri has the most significant relationship to Boyd Medical and Boyd's claims, so this Court will apply Missouri law as to their tort claims. Iowa has the most significant relationship to Wetherill and Addison Medical's claims, so this Court will apply Iowa law as to their tort claims. Thankfully, Nexa cited Missouri and Iowa law in support of its motion for summary judgment alongside legal authority from Texas, the state law it hoped would be applied. In any case, the Court notes that the choice-of-law analysis does not appear to make a

major difference, as tortious interference claims are handled similarly in all three states.

## 2. Plaintiffs' Tortious Interference Claims

In Missouri, the elements of claim of a tortious interference with a business relationship are: "(1) a contract; (2) defendant's knowledge of the contract; (3) intentional interference by the defendant inducing or causing a breach of the contract; (4) absence of justification; and (5) damages resulting from defendant's conduct." ***Guidry v. Charter Communications, Inc.*, 269 S.W.3d 520, 535 (Mo. App. Ct. 2008).** The elements under Iowa law are essentially the same: a plaintiff must show that (1) he had a contract with a third party, (2) the defendant was aware of the contract, (3) the defendant "intentionally and improperly interfered with the contract," (4) this interference caused the third party not to perform, and (5) the plaintiff suffered damages. ***Educational Technology, Ltd. v. Meinhard*, 2001 WL 488088, \*6 (Iowa App. Ct. 2001) (unpublished) (citing *Revere Transducers, Inc. v. Deere & Co.*, 595 N.W.2d 751, 763 (Iowa 1999)).**[6]

As an initial matter, the Court rejects Nexa's argument that it cannot be liable for interfering with a business expectancy because its conduct did not cause Tornier to breach contract. This argument is based on the theory that Tornier had a right to terminate the Plaintiffs for their

---

[6] Plaintiffs argue that Iowa law differs from Missouri law in that Iowa regards justification as an affirmative defense rather than an element of the claim itself. In support of this contention, Plaintiffs cite ***Peterson v. First Nat'l Bank of Iowa*, 392 N.W.2d 158, 167–68 (Iowa Ct. App. 1986).** However, Iowa courts appear to sometimes consider the issue of justification alongside the question of whether the defendant's conduct was improper. *See **Kern v. Palmer College of Chiropractic*, 757 N.W.2d 651, 662–64 (Iowa 2008).** The **RESTATEMENT (SECOND) OF TORTS**, which Iowa follows, recognizes the confusion surrounding this issue: "Justification is generally treated as a matter of defense, but not always in the tort of interference with contractual relations." **§ 766 cmt. c.** Out of an abundance of caution, the Court will consider justification as an affirmative defense with respect to Addison Medical and Wetherill's claims, thereby placing the burden on Nexa to prove justification as to those particular Plaintiffs' claims.

failure to meet first quarter quotas in 2007. However, the Court has already found that a genuine issue of material fact exists as to whether Tornier breached its contract with Boyd Medical (Doc. 126). In part, the Court found that Boyd Medical's claim that Tornier breached the contract insofar as it wrongfully induced Boyd Medical to miss its quotas by setting them at an unattainable level withstood summary judgment. And while the Court has yet to rule on Tornier's motion for summary judgment as to Addison Medical and Wetherill, it stands to reason that their breach of contract claim will withstand summary judgment, since they raise the exact same issue. Accordingly, the argument that no breach of contract occurred provides no basis for summary judgment.

The Court now turns to Plaintiffs' specific allegations. Plaintiffs claim that Nexa tortiously interfered with its business relationship with Tornier by:

> a. Directly and intentionally contacting Tornier and encouraging it to terminate Plaintiffs' agency agreements and appoint one of its distributors in their exclusive territories;
>
> b. Falsely representing to Tornier that it had a distributor that was competent and qualified to take over Plaintiffs' exclusive territories;
>
> c. Entering into an acquisition agreement with Tornier thereby eliminating Plaintiffs' distributorships with Tornier; and
>
> d. Making disparaging comments regarding Plaintiffs' reputations and/or services to Tornier.

(Doc. 95, ¶¶ 65 & 97). Additionally, Boyd Medical claims that Nexa tortiously interfered with its relationship with Tornier by "[p]romising Tornier that its distributor would hire Greg Bryan to induce in part the termination of Boyd Medical" (Doc. 95, ¶ 65(d)).[7] The Court addresses each of

---

[7] Addison Medical and Wetherill do not offer this allegation in support of their claims, and appear to agree that any such conduct did not affect Addison Medical's exclusive distributorship with Tornier.

-7-

these claims individually.

### a. Encouraging Tornier to Work Directly with Archway Medical

Plaintiffs' primary claim is that Nexa encouraged Tornier to terminate its agreements with Plaintiffs and instead use Archway Medical as its exclusive distributor in their territories. There does not appear to be any dispute that the Plaintiffs did in fact have contracts with Tornier, and that Nexa was aware, at least in a general sense, that the Plaintiffs operated exclusive distributorships that overlapped with Archway Medical's territory for Nexa.

Thus, the first question that the Court must confront is whether a genuine issue of material fact exists as to whether Nexa intentionally and improperly interfered with the Plaintiffs' contracts by encouraging Tornier to work with Archway Medical. To start, the Court notes that the nature of Nexa's advocacy on behalf of Archway is clearly in dispute. Nexa claims that its employee, Chris Harber, merely gave its sister corporation[8] his opinion of Nexa distributors when asked. In fact, Harber claimed that he simply informed Greg Sherburn and Jim Hook, both of Tornier, that Archway Medical had a solid infrastructure and could sustain their Nexa sales if kept on (Doc. 109-2, App. 31, Harber Depo., pp. 70-71). He also claims that he made the recommendation that all of Nexa's employees should be retained (Doc. 109-2, App. 27, Harber Depo., p. 22). And though he knew there was a potential that Archway Medical could possibly gain an exclusive Tornier distributorship in its territories, he claims that he only told Sherburn and Hook

---

[8] Plaintiffs contest the exact nature of Tornier's relationship to Nexa during the Winter and Spring of 2007. The undisputed evidence indicates that in January 2007, Tornier U.S. Holdings, Inc. (Tornier, Inc.'s parent company) entered into a merger agreement with Nexa (Doc. 98-2, ¶¶ 2, 3). Under the agreement, Tornier U.S. Holdings acquired Nexa and provided that Nexa would ultimately be merged with Tornier, Inc. The acquisition was complete on February 27, 2007. The merger was complete on December 31, 2007 (Doc. 98-6, App. 469). Accordingly, at the time Tornier terminated Plaintiffs' distributorships, Tornier and Nexa were sister corporations owned by the same parent company.

that Archway Medical was "capable" and had adequate resources to cover Tornier's product line (Doc. 109-2, App. 35, Harber Depo., pp. 96-97).

Sherburn recalls his communications with Harber somewhat differently. Sherburn indicates that Harber advocated directly for Archway Medical to replace Boyd Medical and Addison Medical (Doc. 109-3, App. 67, Sherburn Depo., pp. 203-09). Sherburn's deposition included the following exchange:

> Q. Mr. Harber was suggesting in this initial meeting that Boyd and Addison be terminated and Archway given a distribution territory, wasn't he?
>
> A. I would agree with that (Doc. 109-3, App. 68, p. 205).

In light of this discrepancy (and particularly the fact that Sherburn claims Harber affirmatively advocated that Tornier utilize Archway Medical instead of Plaintiffs), the Court is compelled to find that there is a genuine issue of material fact as to whether or not Nexa "intentionally interfered" with Plaintiffs' business relationship.

The Court must next consider the nature of any possible interference. As noted above, "absence of justification" is the relevant inquiry in Missouri, whereas Iowa law directs the Court to consider whether the interference was improper. However, there is considerable overlap between the two, because Missouri courts have indicated that "conduct lacks justification when a defendant has employed 'improper means' to further the defendant's interests to the detriment of plaintiff." ***Vikings, USA Bootheel MO v. Modern Day Veterans*, 33 S.W.3d 709, 711 (Mo. App. Ct. 2000).**

Missouri caselaw further provides that "improper means" are acts that are "independently wrongful, such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade, or any other wrongful act recognized by statute or the common law." ***Id.* (quoting**

*Nazeri v. Missouri Valley College*, 860 S.W.2d 303, 317 (Mo. banc. 1993)).[9] The Court can not locate anything in the record that would support a finding that Nexa's interference employed improper means under Missouri's standard. The closest argument that Plaintiffs raise regarding improper means is that Harber misrepresented Archway Medical's ability to take over their respective territories. To support this contention, they note that Harber was aware that Archway Medical failed to meet certain Nexa quotas during the first quarter of 2007, but did not tell Sherburn or Hook (Doc. 109-2, App. 36, Harber Depo., pp. 111-14). However, the record indicates that Harber primarily gave opinions as to whether Archway Medical was a capable distributor and indicated that he supported retaining Archway Medical (Doc. 109-2, App. 35 & 39, Harber Depo., pp. 95-97, 128). Moreover, Harber stated that he was never asked about Archway Medical's quota performance (Doc. 109-2, App. 36, Harber Depo., pp. 111-13).

In essence, Plaintiffs argue that Harber could not have been honest in stating that Archway Medical was a "capable" distributor, since it was not performing at quota. But being capable and missing quota are not necessarily contradictory. There may be any number of reasons for a failure to meet quota, and none of the reasons that Archway Medical may have missed quota are explained in the record. Plaintiffs point to nothing in the record that would indicate that Harber

---

[9] Plaintiffs point to ***Rusk Farms, Inc. v. Ralston Purina Co.***, arguing that Missouri courts sometimes apply a more lenient standard. **689 S.W.2d 671 (Mo. App. Ct. 1985).** Plaintiffs claim that while inquiring as to whether improper means were used, the court in ***Rusk*** did not find that the defendant's conduct was unlawful, tortious, or in violation of any statute. However, while the court did not thoroughly address the issue of "improper means," it implicitly found that statements made by the defendant amounted to misrepresentations. Specifically, the defendant asked third parties not to enter into contracts with the plaintiffs for turkeys on the grounds that plaintiffs owed the turkeys to the defendant. In reality, the defendant had breached the parties' contract before sending out the letter and thereby lost any protectable interest in the turkeys. As such, the court essentially found that the defendant had engaged in the wrongful conduct of misrepresenting its rights to third parties. ***See id.* at 679.**

did not actually believe the opinions he was offering—specifically, that Archway Medical could capably continue with the Nexa line, or that it had the infrastructure to serve Tornier's needs.[10] To find otherwise would be to engage in speculation, conjecture, and guess as to Harber's real motivations. Unsupported hypotheses, however, are insufficient to create a genuine issue of material fact. Certainly, the Court understands that Plaintiffs disagree with Harber's assessment of Archway Medical. But that fact that Nexa had recently missed certain sales goals does not necessarily mean that it was incompetent or that it lacked the infrastructure necessary to perform for Tornier in the future. As a result, Plaintiffs have failed to show a genuine issue of material fact that Harber's estimation of Archway Medical's capabilities amounted to misrepresentations.

Additionally, Plaintiffs argue that Harber misrepresented Archway Medical's capabilities because it was inexperienced with Tornier's orthopedic devices and therefore was not qualified to replace Plaintiffs in their territories (Doc. 109-5, App. 180-81, Martin Depo., pp. 25-26, 39-42). However, Sherburn was aware of Archway Medical's lack of experience in certain areas important to Tornier's business, and stated that it did not concern him (Doc. 109-3, App. 73, Sherburn Depo., pp. 257-58).

Aside from providing a positive opinion of Archway Medical, Harber also offered information about Archway Medical's infrastructure, general number of sales representatives, and facilities (Doc. 109-2, App. 31, Harber Depo., pp. 70-71). There is nothing to suggest that Harber's description of these aspects of Archway Medical's business were inaccurate. Under Missouri law,

---

[10] To bolster their position, Plaintiffs point to Archway Medical's performance after it took over for Boyd Medical and Addison Medical. It appears that Archway Medical failed to meet its quota for 2007, and fell farther behind than either Boyd Medical or Addison Medical had been prior to their termination. While this evidence could support the conclusion that Archway Medical was not in fact a better distributor than Plaintiffs, it does nothing to establish whether Harber misrepresented his opinion of Archway Medical's capabilities.

the Court is unable to identify any genuine issue of material fact as to the issue of whether Nexa used any improper means. As a result, Boyd Medical's claim that Nexa's advocacy for Archway Medical constitutes tortious interference must be dismissed.

The Court now turns to Iowa law to determine whether Wetherill and Addison Medical fare any better in their attempt to establish that Nexa used improper means. In deciding whether a defendant's conduct was improper, Iowa courts consider a variety of factors:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

***Hunter v. Bd. of Trs. of Broadlawns Med. Ctr.*, 481 N.W.2d 510, 518 (Iowa 1992) (quoting RESTATEMENT (SECOND) OF TORTS § 767).**

The Court finds that these factors weigh heavily in favor of Nexa. First, the context of Harber's comments is important. Nexa had just been acquired by Tornier's parent corporation, and an agreement was in place whereby Nexa would be merged into Tornier within less than a year. Consequently, the discussions regarding which distributors to retain and which to jettison was a discussion that had to be addressed, since Tornier might otherwise find itself with multiple entities holding exclusive distributorships in overlapping territories. And while Tornier could have waited until the year's end to implement any such changes, it made the legitimate business decision to settle the territory rights sooner rather than later so as to train those distributors whom it expected to keep on Tornier devices. In any case, the timing of the switch was undisputably a Tornier decision—not a Nexa decision.

Additionally, there is no indication that Harber's comments to Tornier executives

were based on any animus or ill-will towards Plaintiffs. If anything, the record overwhelmingly establishes that Harber gave his full support to Nexa distributors, most of whom were not retained. The lack of any evil motive by Harber certainly weighs in Nexa's favor.

Further, it is not lost on the Court that when two companies undertake a merger, it is necessary to share information with each other so as to consolidate the businesses in an efficient and orderly manner. In circumstances such as these, restricting the free exchange of important business information could hamstring the parties' efforts to complete the practical aspects of the merger. Of course, here, the parties' Merger Agreement specifically required Nexa to furnish "access to any and all financial and operating data and other information with respect to the business assets of NEXA and the NEXA Subsidiaries as [Tornier] may from time to time reasonably request" (Doc. 98-7, App. 509, Merger Agreement, §4.5(a)). The need for the exchange of information to facilitate a smooth transfer is clear.

The Court finds that the balance of these factors weighs so heavily in Nexa's favor that no reasonable juror could find that any interference by Nexa was conducted through improper means under Iowa law. Accordingly, the Court finds that no genuine issue of material fact exists to support Plaintiffs' claim that Nexa tortiously interfered with Addison Medical's business relationship as to Tornier by advocating that Tornier hire Archway Medical.

As a result, Plaintiffs' tortious interference claims must be dismissed insofar as they rely on this basis.

### b. Nexa's Alleged False Misrepresentations About Archway's Qualifications

As an independent basis for their tortious interference claims, Plaintiffs allege that Nexa misrepresented Archway Medical's qualifications as a distributor. However, the Court has effectively explained why the record does not support this allegation. Specifically, the evidence

before the Court indicates that Tornier was well-aware of Archway Medical's lack of experience in selling certain orthopedic devices. And while Harber apparently did not inform Tornier that Archway Medical missed certain 2007 monthly quotas, Tornier did not inquire. Importantly, there is nothing in the record to suggest that Harber lied about his opinion of Archway Medical's infrastructure, staff, and overall capabilities.

Accordingly, the Court finds no genuine issue of material fact to support the claim that Nexa tortiously interfered with Plaintiffs' relationship as to Tornier by misrepresenting Archway's qualifications.

### c. The Effect of Tornier's and Nexa's Acquisition Agreement on Plaintiffs

Plaintiffs also claim that Nexa tortiously interfered with their respective Agency Agreements by "entering into an acquisition agreement with Tornier thereby eliminating [Plaintiffs'] distributorship." This claim is also unsupported by the record. The mere existence of the merger agreement did not, in and of itself, require the termination of the Plaintiffs' distributorships. Indeed, the record indicates that dual agency would have been permissible during 2007, as Nexa remained a separate corporation from Tornier, though owned by the same parent. As such, Nexa's distributors could have continued to exclusively sell Nexa products in the same territories that Tornier's distributors exclusively sold Tornier products, at least for the remainder of the year. Tornier even implemented such an arrangement in some of its territories (Doc. 109-3, App. 72, Sherburn Depo., pp. 253–54).

Any possible breach of Plaintiffs' contracts with Tornier was not caused by the merger agreement itself. Though Plaintiffs claim that "Nexa's goal was to have its preferred distributors, such as Archway, brought in as replacements for plaintiffs," (Doc. 109, p. 17) the ultimate decision was undeniably up to Tornier. Whatever hopes Nexa may have had of keeping

its distributors employed, it did not cause Plaintiffs' termination by signing the merging agreement.

Finally, the Court recognizes that the merger itself is what brought multiple distributors into the same territory. But the simple fact that Tornier had a choice as to whether it would retain its own distributors or else utilize Nexa's distributors should be enough to show why Nexa's merger with Tornier did not itself constitute a tortious interference with Plaintiffs' business relationship.

Accordingly, the Court finds that no genuine issue of material fact exists with respect to Plaintiffs' tortious interference claims insofar as they are predicated on Nexa and Tornier's decision to enter into the merger agreement.

### d. Nexa's Comments About Plaintiffs' Reputation

Plaintiffs also claim that Nexa made disparaging comments about their reputations and capabilities. There is nothing in the record whatsoever to support this claim. Harber's testimony indicates that he merely praised Nexa distributors. When asked about replacing Plaintiffs with Archway Medical, Harber stated that he affirmed, "They would be a good choice" (Doc. 109-2, App. 35, Harber Depo., p. 96). And while Sherburn claims that Harber suggested that Plaintiffs' be terminated so that Archway Medical could take over the territory, he gives no indication that Harber ever said anything negative about Plaintiffs. Rather, all indications are that he simply touted the merits of Archway Medical (Doc. 109-3, App. 68, Sherburn Depo., pp. 205-06).

Accordingly, Plaintiffs' claims that Nexa tortiously interfered with their business relationships as to Tornier by making disparaging comments about them is entirely unsupported by the record. As no genuine issue of material fact exists, the Court must dismiss these claims.

### e. Archway Medical's Decision to Hire Greg Bryan

Finally, Boyd Medical claims that Tornier wanted Archway Medical to hire Greg

Bryan, and that Nexa ensured that this would happen, thereby tortiously interfering with Tornier's and Boyd Medical's relationship. This claim must also be dismissed. First, there is nothing in the record to suggest that this was a requirement or request imposed by Tornier. Sherburn stated that while the issue was discussed and Bryan was ultimately hired by Archway Medical, Sherburn was not involved in making it happen (Doc. 109-3, App. 74, Sherburn Depo., p. 263). In fact, Bryan was a Nexa employee—not a Tornier employee (Doc. 109-3, App. 74, Sherburn Depo., p. 262). Tornier opted not to hire Bryan, though it obviously could have. There is no clear indication of why Tornier would have desired that Archway Medical hire Bryan.

Additionally, when initially asked if Archway Medical might have a spot for Bryan, Jim O'Day indicated that he was not sure whether a position would be available but it was possible (Doc. 109-2, App. 39, Harber Depo., p. 129; Doc. 109-3, App. 74, Sherburn Depo., pp. 262-63). Thus, it does not appear that Archway Medical believed it was being asked to hire Bryan as a condition for obtaining a Tornier distributorship. It is also worth noting that Bryan himself was reluctant to accept a position with Archway at first, according to Harber (Doc. 109-2, App. 38-39, Harber Depo., pp. 125-26). And in fact, Harber claims that he informed Bryan that any hiring decision was between Bryan and Archway Medical (Doc. 109-2, App. 39, Harber Depo., p. 127). Most importantly, there is no evidence whatsoever that Tornier or Nexa conditioned Archway Medical's distributorship on the hiring of Bryan. At best, the record indicates that the Defendants inquired as to whether Archway Medical would be open to hiring Bryan. However, Boyd Medical has failed to indicate how this inquiry is causally related to Tornier's termination of Plaintiffs' Agency Agreements. Any connection between the two is entirely speculative.

As a result, the Court finds that no genuine issue of material fact exists with respect to the question of whether Nexa tortiously interfered with Boyd Medical and Tornier's business

relationship by suggesting that Archway Medical hire Greg Bryan.

### D.  Conclusion

For the reasons thoroughly explained above, the Court finds no genuine issue of material fact as to Plaintiffs' tortious interference claims against Nexa (Counts 4 and 8). Accordingly, the Court **GRANTS** Nexa's motion for summary judgment (Doc. 100).  At the close of this case, the Clerk of the Court shall enter judgment in favor of Nexa Orthopedics, Inc. and against Plaintiffs.

Consequently, Plaintiffs' claims against Nexa Orthopedics, Inc. are hereby **DISMISSED with prejudice**.  As Plaintiffs have no further claims pending against this Defendant, Nexa Orthopedics, Inc. is terminated from this action.

**IT IS SO ORDERED.**

**DATED this 16th day of June 2009.**

<u>s/ Michael J. Reagan</u>
**MICHAEL J. REAGAN**
**United States District Judge**