## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

GARRY BOYD, BOYD MEDICAL INC., )
CHARLES WETHERILL, and )
ADDISON MEDICAL, INC., )
                                )
          **Plaintiffs,** )
                                )
**vs.** )      **Case No. 07-cv-0751-MJR**
                                )
TORNIER, INC., and )
NEXA ORTHOPEDICS, INC., )
                                )
          **Defendants.** )

## MEMORANDUM AND ORDER

**REAGAN, District Judge:**

### A.  Background and Introduction

Currently before the Court is Tornier's motion for summary judgment as to Addison Medical and Charles Wetherill (Doc. 99).  Plaintiffs Boyd Medical and Addison Medical are distributors,[1] each of which contracted with Tornier to sell Tornier's orthopedic medical devices in certain regions of the United States.  In 2003, the parties entered into separate contracts through which Boyd Medical became Tornier's exclusive distributor in portions of Illinois, Missouri, and Kansas, and Addison Medical became Tornier's exclusive distributor in Iowa.[2]  The agreement provided that it would last one year, and that either party could terminate the agreement at the end of the term by giving 30-days notice.  If neither party terminated it by this method, the agreement

---

[1]  Plaintiffs Garry Boyd and Charles Wetherill are employees of Boyd Medical and Addison Medical, respectively.

[2]  Boyd Medical's Agency Agreement with Tornier was effective as of March 13, 2003 (Doc. 95-2, Exh. A, p. 6).  Addison Medical's Agency Agreement was effective as of June 2, 2003 (Doc. 95-2, Exh. C, p. 44).

would automatically renew for successive one-year terms. However, Tornier claims that it also had the right to terminate the agreement upon written notice at the end of any quarter in which a distributor failed to reach the projected sales quota, as set by Tornier.

In fact, Tornier terminated its agreements with Boyd Medical and Addison Medical in May 2007, on the grounds that each had failed to meet its first quarter quota that year. In 2007, Tornier also purchased Nexa Orthopedics, which develops and manufactures orthopedic devices. Tornier opted to use Nexa's distributors after terminating its agreements with Boyd Medical and Addison Medical.

On October 31, 2007, Plaintiffs filed this lawsuit against Tornier alleging Breach of Contract (Counts 1 and 5), Fraud in the Inducement (Counts 2 and 6), and Negligent Misrepresentation (Counts 3 and 7).[3]

Tornier moved for summary judgment against Addison Medical and Charles Wetherill on March 9, 2009 (Doc. 99). Plaintiffs submitted a response on April 3, 2009 (Doc. 107), and Tornier submitted a reply on April 10, 2009 (Doc. 111). Having fully reviewed the parties' filings, the Court hereby **GRANTS IN PART AND DENIES IN PART** Tornier's motion for summary judgment (Doc. 99).

### B. Factual Background

Addison Medical signed an Agency Agreement with Tornier on June 2, 2003, which granted Addison Medical an exclusive distributorship to sell Tornier products in the assigned territory (Doc. 95-2, Exh. C). This territory was made up of "[t]he State of Iowa, east of Hwy 71"

---

[3] Plaintiffs also sued Nexa for Tortious Interference with a Business Relationship (Counts 4 and 8). However, the Court recently granted summary judgment in favor of Nexa on all claims (Doc. 130). Defendants Archway Medical, Inc. and James O'Day were voluntarily dismissed without prejudice on November 7, 2008 (Doc. 73).

(Doc. 95-2, Exh. C, Appendix II). The agreement provided two separate methods of termination. First, either party could terminate the agreement "as of the end of the term upon not less than thirty (30) days prior written notice" (Doc. 95-2, Exh. C, ¶ 9.1). However, Section 9.3 of the Agency Agreement also stated that Tornier "shall have the right to terminate this Agreement upon written notice to the Agency following the close of any quarter in which the projected minimum sales have not been attained by the Agent" (Doc. 95-2, Exh. C, ¶ 9.3). Despite this provision, the Tornier Agency Manual, which is expressly incorporated into the Agency Agreement (*see* Doc. 95-2, Exh. A, ¶ 1.6), states:

> Sales performance for any given quarter that is more than 25% behind quota may result in immediate termination of the Agency Agreement.

> When sales performance is less than 25% behind quota, the following steps may be initiated:

>> • First Warning – this is a verbal warning that requires the Agent to improve performance and achieve quota levels within 30 to 60 days as specified by TORNIER, Inc.

>> • Second Warning – this is a written communication between the Agent and TORNIER and it requires the Agent to meet quarterly sales objectives (quota) within 30 to 60 days as specified by TORNIER, Inc.

>> • Performance Improvement Plan or Written Probation – this is a written set of requirements that must be attained (including but not limited to attainment of quota) for the Agency Agreement to remain in effect.

>> • Termination – may occur when performance is not improved following the implementation of the three actions described immediately above (Doc. 95-2, Exh. B, p. 6).

Addison Medical failed to meet quota in any year from 2004 to 2006 (Doc. 107-4, App. 160, Wetherill Depo., pp. 52-53) and met its quarterly quota only three times during this period

(Doc. 64-6, App. 113). Nonetheless, Tornier renewed Addison Medical's Agency Agreement each year. Additionally, Rick Carrow, a Tornier executive, told Wetherill in 2004 that he was "the man in Iowa" (Doc. 107-5, App. 205). In 2006, Carrow said that Wetherill was "a big part" of what he referred to as Tornier's "New Dawn" (Doc. 107-5, App. 207). Around that same time, he also told Wetherill that he was "top shelf" (Doc. 107-5, App. 206). With respect to the fact that Addison Medical struggled with its quotas, Wetherill claims that Carrow told him he had "nothing to worry about" and referred to Wetherill as "the chosen one" (Doc. 107-4, App. 165, Wetherill Depo., pp. 88-89).

During the parties' relationship, Addison Medical claims that Tornier's representatives indicated that if Addison Medical made certain changes to its business model, Tornier's business relationship would continue. Specifically, Addison Medical claims that it was continually asked to hire more employees and avoid selling products from other lines so that the focus would remain on promoting Tornier's products. Addison Medical claims that it did in fact hire additional employees , including one in late 2006. However, Tornier claims that it only informed its distributors that this was its preference and never promised any distributor, including Addison Medical, that it would remain a Tornier distributor simply because it complied (Doc. 108-4, App. 117, Carrow Depo., pp. 49–50).

At the beginning of 2007, Addison Medical received its quotas from Tornier. Addison Medical's 2007 quota included a 73% increase over its 2006 quota (Doc. 64-6, App. 113). The first quarter quota also included some products that Plaintiffs claim were not yet available or else had only limited availability (*see* Doc. 108-4, App. 134, Boyd Depo., p. 45), though Tornier claims that all products were available for sale in 2007 (Doc. 108-2, App. 18–19, Sherburn Depo., pp. 190–96). Nonetheless, Addison Medical never asked Tornier to alter the quota, and Wetherill

indicated that he was "not too concerned for the overall all performance" in mid-February 2007 (Doc. 107-6, App. 237; Doc. 107-4, App. 163, Wetherill Depo., pp. 71-72).

At the end of the first quarter in 2007, Addison Medical failed to meet its quota of $237,375 and sold only $110,991, which is approximately 47% of the quota (Doc. 64-6, App. 113). At some point in March 2007, Tornier decided to terminate Addison Medical as a distributor and replace it with Archway Medical (Doc. 108-2, App. 23, Sherburn Depo., pp. 210–212). The termination of Addison Medical's distributorship was confirmed by letter dated May 14, 2007, and became effective May 31, 2007 (Doc. 64-7, App. 188). Archway began work as a Tornier distributor in Addison Medical's territory in June 2007 (Doc. 98-7, App. 569, O'Day Depo., p. 192).

## C. Legal Standards Governing Summary Judgment Motions

Summary judgment is appropriate when there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. ***Celotex Corp. v. Catrett***, **477 U.S. 317, 322-23 (1986)**. **FEDERAL RULE OF CIVIL PROCEDURE 56(a)** provides:

> [Summary judgment] should be rendered if the pleadings, the discovery and disclosure materials on file and any affidavits show that there is no genuine issue as to any material fact that the movant is entitled to as a matter of law.

Because the primary purpose of summary judgment is to isolate and dispose of factually unsupported claims, the non-movant may not rest on the pleadings but must respond, with affidavits or otherwise, setting forth specific facts showing that there is a genuine issue for trial. ***Oest v. IDOC***, **240 F.3d 605, 610 (7th Cir. 2001);** ***Moore v. J.B. Hunt Transport, Inc.***, **221 F.3d 944, 950 (7th Cir. 2000).** The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." ***Anderson v. Liberty Lobby, Inc.***, **477 U.S. 242, 248 (1986).**

The burden is on the non-moving party to produce specific facts that show a genuine issue for trial. **FED.R.CIV.P. 56(e);** *Moore*, **221 F.3d at 950.** "Conclusory allegations and self-serving affidavits, if not supported by the record, will not preclude summary judgment." *Haywood v. North American Van Lines, Inc.*, **121 F.3d 1066**, **1071 (7th Cir. 1997);** *see also* **FED.R.CIV.P. 56(e) ("an opposing party may not rely merely on allegations or denials in its own pleading")**.

In determining whether a genuine issue of material fact exists, the Court views the record in the light most favorable to—and draws all reasonable inferences in favor of—the non-moving party. *Anderson*, **477 U.S. at 255.**

## D. Addison Medical's Breach of Contract Claims

### 1. Governing Law

As a federal court exercising diversity jurisdiction, this Court applies federal law in resolving procedural and evidentiary issues, and Illinois law with respect to substantive law. *Bevolo v. Carter*, **447 F.3d 979, 982 (7th Cir. 2006) (citing** *Colip v. Clare*, **26 F.3d 712, 714 (7th Cir. 1994)).** As such, this Court applies Illinois's choice-of-law rules to determine the applicable substantive law. *See Hinc v. Lime-O-Sol Company*, **382 F.3d 716, 719 (7th Cir. 2004);** *Kohler v. Leslie Hindman, Inc.*, **80 F.3d 1181, 1184 (7th Cir. 1996)**. Illinois follows the **RESTATEMENT (SECOND) OF CONFLICT OF LAWS** in making such decisions. *Midwest Grain Products of Illinois, Inc. v. Productization, Inc.*, **228 F.3d 784, 787 (7th Cir. 2000)**.

For contracts claims, the Restatement and Illinois law respect a contract's choice-of-law clause as long as the contract is valid. *Kohler*, **80 F.3d at 1185.** In this case, the parties' contract includes a choice-of-law provision, which provides that the contracts "shall be construed and determined in accordance with the laws of the State of Texas." **Doc. 95-2, ¶ 10.12; Doc. 28-3.** As the parties do not contest the contracts' validity, the Court applies Texas law to Plaintiffs' breach

of contract claims.

## 2. Termination of the Agency Agreement

It is well-settled under Texas law that the elements necessary to prove a claim for breach of contract are (1) the existence of a valid contract, (2) plaintiff's performance or tendered performance of the contract, (3) defendant's breach of the contract, and (4) plaintiff's damages. *Lopez v. M.G. Bldg. Materials, Ltd.*, -- S.W.3d --, 2009 WL 1546145, *4 (Tex. App. June 3, 2009).

In Count 5, Plaintiffs claim that Tornier breached that agreement by engaging in a wide variety of conduct, including setting unattainable quotas for the first quarter of 2007, developing these quotas without proper consideration of the Agency Manual's stated guidelines, failing to make adequate efforts to support Addison Medical's sales, appointing another distributor in Addison Medical's territory prior to the termination of Addison Medical's exclusive distributorship, and terminating Addison Medical for reasons other than its failure to meet its first quarter quota.[4] Tornier argues that all of Addison Medical's breach of contract claims fail.

### a. Tornier's Motivation for Terminating Addison Medical

The Court begins with Addison Medical's claims that Tornier breached contract for terminating its distributorship for reasons other than its failure to meet quota. For instance, Addison Medical claims it was terminated because it did not have a separate office or a specific number of salespeople. As the Court noted in its Order granting in part Tornier's motion for summary judgment as to Boyd Medical and Garry Boyd (Doc. 126), this claim misses the point. Addison

---

[4] The complaint also includes an allegation that Tornier failed to pay commissions and compensation for returned samples. However, the parties' filings indicate that while this may have been at issue earlier in the litigation, the parties have resolved any dispute as to outstanding commissions and reimbursements. As a result, the Court need not address this issue further.

Medical's breach of contract claim depends on whether or not Tornier had the right to terminate its distributorship. Tornier appears to concede that the only valid basis it may have had to terminate the distributorship is Addison Medical's undisputed failure to meet its first quarter quota in 2007. If Tornier had the right to terminate the agreement at the end of that quarter, then there was no breach, regardless of whether Tornier may have had other reasons for the termination. Accordingly, Addison Medical's breach of contract claims must be dismissed insofar as they rely on Tornier's ulterior motives for termination.

### b. The Attainability of Addison Medical's Quotas

This brings the Court to the question of whether Tornier did in fact have the right to terminate Addison Medical's distributorship due to its failure to meet quota. As noted above, Section 9.3 states that Tornier "shall have the right to terminate this Agreement . . . following the close any quarter in which the projected minimum sales have not been attained by the Agent" (Doc. 95-2, Exh. A, p. 4, ¶ 9.3). Unlike Boyd Medical, Addison Medical does not argue that the Agency Manual further required the implementation of a Performance Improvement Plan prior to termination. The reason for this is obvious: at best, the Agency Manual can be read to require Tornier to provide warnings and opportunities to a distributor who is within 25% of its quarterly quota (Doc. 95-2, Exh. B, p. 6).[5] However, where a party sells at less than 75% of its quota, the Agency Manual permits Tornier in no uncertain terms to terminate that distributor. Addison Medical was nowhere near the relevant threshold, as it only sold 47% of its quota.

_____

[5] In its recent Order granting in part Tornier's motion for summary judgment as to Boyd Medical and Garry Boyd, the Court found that the competing provisions in the Agency Agreement and the Agency Manual create an ambiguity as to whether Tornier can in fact automatically terminate a distributor who fails to meet quota by less than 25% (Doc. 126, pp. 8–10).

As a result, it appears that Addison Medical's primary breach of contract claims rests on the allegation that Tornier set unreasonable and unattainable quotas. Tornier argues that this is not a valid basis for a breach of contract claim, because the contract does not explicitly require Tornier to set "attainable" or "reasonable" quotas. Plaintiffs, on the other hand, argue that these terms are implied by the Agency Agreement.

The parties' agreement provides that Tornier "shall determine projected sales and shall communicate that information to the Agent for the initial calendar year" (Doc. 95-2, Exh. C, ¶ 9.2). Those sales are also to be taken into account each year that the contract is renewed. Though Tornier clearly had discretion in calculating annual quotas, the Agency Manual provided that yearly quotas would be "based on demographics, sales history and market potential" (Doc. 95-2, Exh. B, p. 5). Addison Medical claims that it is unaware of the particular calculations Tornier made to arrive at its 2007 quota, but that in any event, the first quarter quota was unattainable.

The Court has already rejected the argument that the contract includes any implied term that quotas be "reasonable" and "attainable" (Doc. 126, pp. 11–15). As noted in the Court's previous Order, the law on this issue is clear:

> Implied covenants are not favored in Texas law. Thus, it is only in rare circumstances that a court will imply a covenant in a contract. A term will not be implied simply to make a contract "fair, wise, or just." A court will only look beyond the written agreement to imply a covenant if necessary to effectuate the parties' intent as disclosed by the contract as a whole.

***Gamma Group, Inc. v. Transatlantic Reinsurance Co.*, 242 S.W.3d 203, 212–13 (Tex. App.-Dallas 2007) (internal citations omitted).** The Court sees no reason to imply a term of "reasonability" or "attainability" into the parties' contract here, because the parties specifically included guidelines for the calculation of quotas. The parties obviously intended that the quotas

would be calculated pursuant to those factors, and this Court will not disturb the parties' clear intent.

But as the Court found with Boyd Medical's claims, this does not mean that the calculation of Addison Medical's 2007 quarterly quotas is irrelevant. The thrust of Plaintiffs' claim with respect to this issue is clear: Tornier purposely set unreasonably high first quarter quotas so as to thwart their ability to maintain their distributorships. In other words, Tornier caused the contract to fail by setting unattainable quotas, which in turn caused the condition necessary to terminate the contract (i.e., Addison Medical's failure to meet its first quarter quota).

Under Tornier's reading of the contract, a distributor cannot be terminated mid-contract, so long as it satisfies the condition of meeting its quarterly quotas. If Addison Medical can show that Tornier set unattainable quotas so as to prevent Addison from satisfying the condition, however, Addison Medical may state a valid breach of contract claim. ***See Dorsett v. Cross*, 106 S.W.3d 213, 217 (Tex. App. 2003); RESTATEMENT (FIRST) OF CONTRACTS § 295.**

The Court finds that a genuine issue of material fact exists as to this issue. First, Plaintiffs offer expert testimony that a 20% increase in quota is standard in the industry and that business in the orthopedic medical sales industry tends to be lower at the beginning of the calendar year. Charles Wetherill also testified that given the relatively small population of Iowa, his performance in 2006 was well above-average and did not justify such a high increase in quota (Doc. 107-4, App. 160, Wetherill Depo., p. 52). The testimony offered by Plaintiffs could convince a jury that Tornier's decision to give such a large increase in quota was unreasonable, and that such conduct prevented Addison Medical from meeting its quota, thereby subjecting it to termination.

The Court recognizes that Tornier makes a strong argument that Addison Medical cannot show that any such conduct on Tornier's part is causally related to its damages, because it would not have met any quota increase from 2006. Indeed, Addison Medical's first quarter quota

for 2006 was $134,772, and in the first quarter of 2007, Addison Medical only sold $110,991 (Doc. 64-6, App. 113). As such, Tornier would have had to reduce quota in order for Addison Medical to achieve its first quarter quotas in 2007. However, Tornier must also recognize that an outstanding fact question exists as to the whether the parties' Agency Agreements permit automatic termination if they simply miss quota, or whether a distributor who is within 25% of quota must be given opportunities to improve before termination (*see* Doc. 126). If the jury was to decide that the parties intended the latter, then it is an open question as to how close Addison Medical's performance would have been to a reasonable and attainable quota. As such, a genuine issue of material fact exists as to this issue.

The Court also notes that Addison Medical argues that its first quarter quota was unreasonable because it was required to sell products that were either unavailable or else had limited availability. These products were the Salto Talaris ankle, the humeral plate, and the resurfacing head. Tornier claims that these items were available, and its various distributors sold them during the first quarter of 2007 (Doc. 98-4, Sherburn Declaration; Doc. 98-3, Lamendola Declaration). This dispute also creates a genuine issue of material fact, as already explained by the Court (*see* Doc. 126). In short, Plaintiffs have presented testimony that they were unable to obtain these products during the first quarter of 2007 (Doc. 108-4, App. 134, Boyd Depo., p. 45). Additionally, James O'Day, an employee with Archway—Plaintiffs' replacement—stated that the humeral plate was only available if customers asked for it (Doc. 98-7, App. 239, O'Day Depo., p. 191). Sherburn also indicated that the humeral plate was available on a "limited basis" and that there were limitations on the resurfacing head as well (Doc. 108-2, App. 18, Sherburn Depo., pp. 190–92).

With respect to the ankle, it appears that a distributor was not permitted to sell it unless the physician purchasing it had been trained on it. Addison Medical did enroll one physician

in a training course, but the other courses filled up before Addison could enroll any more. However, when Tornier calculated Addison's quotas at the end of 2006, it is not clear that it considered the fact that Addison may not have been able to sell the ankle at quota during the first quarter given its failure to send enough physicians to training. And while the inability to sell these products was not the primary reason that Addison Medical failed to meet its quota, the potential lack of availability of certain items included in that quota would go to the issue of whether Tornier purposely set unreasonable quotas. Though it appears that the products in question were available to some extent, there is sufficient evidence that a jury could find that the limited availability of these items made the quota intentionally unreasonable. Thus, the Court finds that there is a genuine issue of material fact as to this issue.

As the Court indicated above, Addison Medical also argues that the quotas were unreasonable because Tornier failed to consider all of the factors identified in the Agency Manual—"demographics, sales history and market potential" (Doc. 95-2, Exh. B, p. 5). The record is not fully developed on this issue, and it is not clear whether Tornier did in fact consider all of the factors identified in the Agency Manual. For instance, Greg Sherburn, Tornier's Vice President of Sales, stated that when setting quotas, he primarily considered sales from the previous year and also accounted for any price increases as to Tornier's products (Doc. 108-2, App. 17, Sherburn Depo., pp. 177–180). He failed to mention any consideration of demographics or market potential, however. Because the record is not clear on this point, a genuine issue of material fact remains and summary judgment cannot be granted.

### c. Waiver

Next, Addison Medical argues that Tornier waived its right to terminate by not doing so on the prior occasions that Addison Medical missed quota. The Court rejects this argument and

finds no genuine issue of material fact with respect to this question.  Tornier did not waive any termination rights it had under the Agreement.

"Waiver is largely a matter of intent.  For implied waiver to be found through a party's actions, intent must be clearly demonstrated by the surrounding facts and circumstances." ***Southwest Grain Co. v. Garza*, 2007 WL 1087179, \*8 (Tex. App. April 12, 2007).**  And while waiver usually presents a question of fact, "when the facts and circumstances are undisputed, the question becomes one of law."  ***Id.***  Here, the undisputed facts create a question of law.

The contract itself provides: "The failure of either party to enforce at any time any of the provisions hereof shall not be a waiver of that party's right thereafter to enforce any such provision of the Agreement" (Doc. 95-2, Exh. C, ¶ 10.3).  This clause was renewed each year along with the contract, including in January 2007.  The presence of this clause, and its renewal without alteration, strongly indicates that Tornier did not intend to waive any right to terminate it may have had under the contract.

That no waiver occurred is also evident because the record clearly shows that Tornier repeatedly expressed its concern to Addison Medical in 2007 that it was substantially behind its first quarter quota.  Tornier also warned Addison Medical that given the direction Tornier was moving, it would need distributors who could effectively keep up with quota and help Tornier grow.  For instance, on February 13, 2007, Wetherill emailed Carrow to indicate that he was not concerned that Addison Medical was behind quota and assured Carrow that it would ultimately catch up (Doc. 107-6, App. 237).  On February 19, 2007, however, Carrow replied back stating:

> I must respectfully disagree with your implied time frame.  Time is of the ESSENCE when looking at the First (1st) Quarter.  At the conclusions of that, "Measuring Stick", I don't want you to be so far behind that you can't get out of the deficit and find an equation to catch-up and/or surpass the 2007 assigned Distributor Quota for Iowa

-13-

> . . . Tornier has grown from a Small Company to a Bigger Company
> with it's (sic) sights set on becoming an even BIGGER COMPANY
> and EVERY DISTRIBUTOR must grow with us in that regard or we
> must move on to someone who will.

(Doc. 107-6, App. 237).  When Addison Medical failed to pick up the pace, Carrow sent Wetherill

another email, stating: "I would be less than honest if I didn't express my concern with respect to

getting back on course for Performance to Quota. . . . I will NOT allow this situation to become

irretrievable.  Regardless of the situation, Quota is Quota, and we MUST act accordingly" (Doc. 98-

6, App. 463).  Such conduct certainly does not support Plaintiffs' contention of waiver.  Rather, all

indications are that Tornier did not waive its right to terminate and made sure that Addison Medical

was aware of its position very early after the Agreement was renewed in 2007.

Having considered all of the relevant circumstances, the Court finds that Tornier did

not waive any rights it had under Section 9.3.  Addison Medical has failed to meet its burden of

showing that a genuine issue of material fact exists with respect to the question of waiver.

### e.  Whether Tornier Adequately Supported Addison Medical

Next, Tornier argues that the Court should dismiss the portion of Addison Medical's

breach of contract claim that alleges Tornier failed to make "every effort" to support Addison

Medical's 2007 sales.  This claim is based on a statement in the Agency Manual under the heading

"Sales Meetings" that "TORNIER, Inc. makes every effort to support national, regional and local

sales efforts" (Doc. 95-2, Exh. B, p. 22).   However, what constitutes "every effort" is clarified

immediately thereafter:

> National and regional meetings will be arranged by TORNIER, Inc.
> personnel.
>
> Requests for local meeting support should be addressed with your
> Sales Manager.

> Any commitments and/or obligations made by the Agent or their
> representative on behalf of TORNIER, Inc. will be the responsibility
> of the Agency unless pre-approved by TORNIER, Inc. (Doc. 95-2,
> Exh. B, p. 22).

Obviously, there is an inherent ambiguity in the term "every effort." Reading the contract as a whole, the Court cannot construe this provision to mean that Tornier must do everything that its distributors ask it to do, but rather that Tornier would undertake reasonable efforts to support its distributors' sales.

It should be clear from the Court's earlier analysis that a genuine issue of material fact exists as to whether Tornier did in fact undertake reasonable efforts to support Addison Medical's sales. Again, certain products in Addison's quota may have been available only on a limited basis. And with respect to the Salto Talaris ankle, Addison argues that he was not given sufficient time to sign physicians up for training after learning that the ankle was a component of its first quarter quota. Tornier notes that Addison Medical could have sent doctors to training sessions in 2006, but it appears that the ankle was not part of Addison Medical's quota at the time, and once it was, the only remaining training sessions may have been full, possibly giving Addison Medical little to no chance of selling the ankle during the first quarter of 2007.

Addison Medical also argues that despite its inability to meet Tornier's high quota, Tornier failed to give Addison adequate suggestions or opportunities to catch up. In support of this position, Addison Medical offers Charles Wetherill's testimony that he repeatedly requested literature in 2007, but received very little to pass along to clients (Doc. 107-4, App. 159, Wetherill Depo., pp. 42–45). Wetherill claimed that this hindered his efforts to promote and sell Tornier products. Because a genuine issue of material fact exists as to whether Tornier used adequate efforts to support Addison Medical, the Court cannot grant summary judgment as to this issue.

### f. Breach of Exclusivity Clause

Finally, the Court addresses Addison Medical's claim that Tornier breached the exclusivity clause by appointing Archway as its distributor in Iowa before Addison Medical's contract had been terminated. This claim is wholly unsupported by the evidence in the record. It is undisputed that Addison Medical's Agreement with Tornier was terminated in May 2007. Jim O'Day testified that Archway did not begin work as a Tornier distributor until June 2007 (Doc. 98-7, App. 569, O'Day Depo., p. 192). Addison Medical offers nothing to rebut this statement. Accordingly, there is no evidence to support the claim that Tornier permitted the two distributors to overlap prior to June 2007. Because no genuine issue of material fact exists, this aspect of Plaintiffs' breach of contract claim must be dismissed.[6]

In summary, the Court **GRANTS** the motion for summary judgment as to Plaintiffs' breach of contract claims (1) that Tornier terminated its distributorship for motives other than Addison Medical's failure to meet its quota and (2) that Tornier breached the exclusivity clause of the agreement. Additionally, the Courts finds that Tornier has not waived any of its termination rights under the agreement. The Court **DENIES** Tornier's motion for summary judgment on Plaintiffs' breach of contract claims in all other respects.

### E. Plaintiffs' Tort Claims

### 1. Governing Law

The Court now turns to Tornier's motion for summary judgment as to Charles Wetherill and Addison Medical's tort claims. As noted above, this Court applies Illinois's choice-

---

[6] In its motion, Tornier also includes a footnote suggesting that Charles Wetherill's breach of contract claim should be dismissed due to his lack of privity with Tornier. However, this undeveloped argument will not be addressed by the Court because it is not accompanied by any legal discussion or citation to the record. However, after sufficient development, the Court will entertain any well-taken motion at the Rule 50 stage.

of-law rules to determine the applicable substantive law. In determining which state's law applies to Plaintiffs' tort claims against Tornier, the Court "select[s] the law of the jurisdiction that has the 'most significant relationship' to the events out of which the suit arose, and to the parties." ***Carris v. Marriott International Inc.*, 466 F.3d 558, 560 (7th Cir. 2006) (citing *Esser v. McIntyre*, 661 N.E.2d 1138, 1141 (Ill. 1996)).** The law of the place where the injury occurred is presumed to apply unless another state has a more significant relationship to the occurrence or parties. ***Pittway Corp. v. Lockheed Aircraft Corp.*, 641 F.2d 524, 527 (7th Cir. 1981); *see Spinozzi v. ITT Sheraton Corp.*, 174 F.3d 842, 844 (7th Cir. 1999).** In determining whether another state has a more significant relationship to the occurrence or parties, the Court may also consider (1) the place where the injury causing conduct occurred, (2) the domicile of the parties, and (3) the place where the relationship of the parties is centered. ***Pittway Corp.*, 641 F.2d at 527.**

The place of the injury as to Plaintiffs' tort claims is Iowa, as Wetherill is domiciled there and Addison Medical's distributorship was centered there. In fact, Addison Medical only distributed Tornier products in Iowa. Accordingly, the Court applies Iowa law to Plaintiffs' tort claims.

## 2. Plaintiffs' Negligent Misrepresentation Claims

The Court now turns to Count 7 of Plaintiffs' complaint, which attempts to state a cause of action for negligent misrepresentation.[7] As the Court explained in its Order granting in part Tornier's motion to dismiss (Doc. 91), Iowa law follows the **RESTATEMENT (SECOND) OF TORTS § 552**, which provides:

---

[7] Plaintiffs complaint erroneously labels Wetherill and Addison Medical's negligent misrepresentation claims as "Count III" (Doc. 95, p. 23). The Court recognizes this error and construes the complaint as alleging negligent misrepresentation claims on behalf of these particular Plaintiffs as Count 7.

> One who, in the course of his business, profession or employment or in any other transaction in which he has a pecuniary business, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Jacobs v. City of Iowa City*, 2004 WL 433738, *4 (Iowa App. Ct. 2004) (citing *Freeman v. Ernst & Young*, 516 N.W.2d 835, 837 (Iowa 1994)). However, Iowa courts apply this standard narrowly such that "liability for negligent misrepresentation arises only when the information is provided by persons in the business or profession of supplying information to others." *Id.* (citing *Hendricks v. Great Plains Supply Co.*, 609 N.W.2d 486, 492 (Iowa 2000)).

> The Supreme Court of Iowa explained that

> when deciding whether the tort of negligent misrepresentation imposes a duty of care in a particular case, we distinguish between those transactions where a defendant is in the business or profession of supplying information to others from those transactions that are arm's length and adversarial. . . . We recognize the former circumstances justify the imposition of a duty of care because a transaction between a person in the business or profession of supplying information and a person seeking information is compatible to a special relationship. . . . On the other hand, information given gratuitously or incidental to a different service imposes no such duty.

*Sain v. Cedar Rapids Cmty. School Dist.*, 626 N.W.2d 115, 124 (Iowa 2001). Factors indicating that a party is in the business of supplying information include "whether they are engaged in supplying guidance to others in a non-adversarial capacity" and "whether the information was part of the product provided by the business." **Lee County v. IASD Health Serv. Corp.**, 2000 WL 290367, *9 (Dist. Iowa 2000) (finding that a negligent misrepresentation claim was actionable against an insurance provider where plaintiffs paid an administrative fee for monthly statements regarding the types of insurance available and recommendations as to which plans**

**would best serve them).**

Tornier claims that Wetherill and Addison Medical's negligent misrepresentation claims must be dismissed for failure to produce any evidence to suggest that Tornier is in the business of supplying information. In their response, Plaintiffs state that "the Amended Complaint very clearly alleges that Tornier supplied information for guidance to plaintiffs in their business transactions" (Doc. 107, p. 15 n.11). Indeed, the Amended Complaint does state that "Tornier supplied the information contained in the representations as to Addison Medical . . . in the course of its business transactions with Wetherill and/or Addison Medical for guidance in plaintiffs' sales efforts on its behalf" (Doc. 95, ¶ 87).

The Court agrees that Plaintiffs' have attempted to allege facts in their Amended Complaint that would support a claim of negligent misrepresentation under Iowa law. But the parties are now at the summary judgment stage. Mere allegations are not enough. The mere fact that Tornier may have made certain representations so as to guide plaintiffs in their sales efforts does not alone support the claim that Tornier is "in the business of supplying information," nor could it support a finding that supplying information is "part of the product provided by the business." To be sure, nearly every business relationship, especially those based on sales, involves some sharing of information regarding future plans, the quality of performance, and products.

Clearly, to state a claim for negligent misrepresentation in Iowa, the business itself must focus, at least in part, on the supply of information. But Addison Medical and Wetherill did not contract with Tornier to obtain guidance or information. The Plaintiffs' agreement simply permitted them to perform a service for Tornier—the sale and distribution of Tornier's products. There is absolutely nothing in the record to support the allegation that Tornier provides guidance or information as part of its actual product.

As a result, the Court must find that Addison Medical and Wetherill have failed to establish a genuine issue of material fact with respect to their negligent misrepresentation claims (Count 7). Accordingly, summary judgment must granted in favor of Tornier as to these claims.

### 3. Plaintiffs' Fraudulent Misrepresentation Claims

With respect to Wetherill and Addison Medical's fraudulent misrepresentation claims, Iowa law requires that Plaintiffs establish seven elements "by a preponderance of clear, satisfactory, and convincing evidence . . . : (1) representation, (2) falsity, (3) materiality, (4) scienter, (5) intent, (6) justifiable reliance, and (7) resulting injury." *Fong v. All Lots, L.L.C.*, -- N.W.2d --, 2009 WL 1492561, *5 (Iowa App. Ct., May 29, 2009); *Cornell v. Wunschel*, 408 N.W.2d 369, 374 (Iowa 1987) (citing *B & B Asphalt Co. v. T.S. McShane Co.*, 242 N.W.2d 279, 284 (Iowa 1976)).

Plaintiffs claim that Tornier made the following material misrepresentations:

a.  That Addison Medical's relationship with Tornier would continue for three to five years;
b.  That Tornier would provide everything Addison Medical needed to succeed and meet its quotas;
c.  That Addison Medical "had nothing to worry about" in 2006;
d.  That Addison Medical should not acquire non-competing lines because Tornier would eventually fill any voids in the product line;
e.  That Addison Medical would be the exclusive distributor of Nexa in Iowa;
f.  That if Addison Medical hired additional employees, its relationship with Tornier would continue;
g.  That Wetherill "had nothing to worry about" in 2007;
h.  That Wetherill "was the man in Iowa," suggesting that he was a model distributor;
i.  That Tornier would set quotas at attainable levels; and
j.  That Tornier would support Addison Medical's sales efforts by making new products, marketing materials, and training opportunities available on a timely basis.

Because of the large number of alleged misrepresentations, the Court addresses each separately.

First, there is no evidence to support Plaintiffs' claim that Tornier ever represented that it would remain a distributor for three to five more years. Wetherill stated in his deposition that Tornier's owner stressed his plan to spend at least three to five years building Tornier before going public, and that "Tornier management stressed the critical importance of having three to five year business plans for each agency" (Doc. 107-4, App. 166, Wetherill Depo., pp. 104-05). But of course, this is not a representation that Addison Medical itself would maintain a relationship with Tornier over five years. Plaintiffs appear to have simply assumed that their contracts would be renewed over such a period. In any case, the fact that the contract was renewed for only one year at a time establishes that any reliance on the implication that the distributorship would be retained for a lengthier term was unjustified. The contract clearly provided that it would last only one year, and that it could either be terminated at the end of that term, or else renewed. There was no guarantee of renewal. As such, Plaintiffs have failed to establish that a genuine issue of material fact exists to show that Tornier made this particular misrepresentation or that Plaintiffs justifiably relied on the statement.

Next, the Court considers the alleged misrepresentations that Tornier would provide everything that Addison Medical needed to succeed and that Tornier would make new products, marketing materials, and training opportunities available. These representations are not actionable because the record indicates that they were made after the 2007 Agreement went into effect (*see* Doc. 107-4, App. 160, Wetherill Depo., p. 53). Consequently, Addison cannot and does not provide any evidence indicating that he actually relied on these statements. For instance, Addison Medical does not claim that it relaxed in its attempts to sell Tornier products due to the false hope that help would be forthcoming at a later date. By all indications, Addison tried to make its first quarter quota, but failed. Nor does Addison Medical claim that it delayed performance while waiting for

Tornier to provide new products and marketing materials. In short, there is nothing in the record to suggest that Addison Medical justifiably relied on this alleged misrepresentation. As no genuine issue of material fact exists with respect to this issue, the Court must dismiss these particular misrepresentation claims.

Likewise, Rick Carrow's statements in 2006 and 2007 that Addison "had nothing to worry about" do not constitute actionable misrepresentations. In essence, it appears that Plaintiffs took the statement to mean that Addison Medical's distributorship would not be terminated despite the fact that it was far behind quota. There is no evidence to indicate that Addison relied on any such statement. Again, there is no indication that the security that this statement instilled in Addison Medical led it to lessen its efforts to meet quota, which was the ultimate factor permitting the contract's termination. And in any case, any reliance on Addison Medical or Wetherill's part would have been clearly unjustified. As explained above, every time the contract was renewed it was only for one year, and it always included clauses permitting Tornier to terminate the relationship either at the end of the term or else for failure to maintain quarterly quotas. For Addison Medical to rely on a statement that it had "nothing to worry about" in the face of yearly renewal of these contract terms is entirely unjustified. As no genuine issue of material fact exists with respect to this particular misrepresentation claim, it must be dismissed.

The Court is compelled to reach the same conclusion with respect to the various compliments that Tornier bestowed upon Wetherill. This includes the statement that he was "the man in Iowa." That statement was made in July 2004. As such, there is no causal relationship between that isolated statement and any alleged damages. Also, Plaintiffs have made no showing as to how Wetherill actually relied on this statement to his detriment or that Carrow intended that he rely on it. Finally, there has been absolutely no showing that Carrow did not believe this vague

statement of opinion when he made it—nearly three years prior to Addison Medical's termination. Accordingly, the Court finds no genuine issue of material fact as to this alleged misrepresentation either.

Tornier next attacks the claim that it misrepresented that Addison Medical would keep its exclusive distributorship if it continued to hire new employees. Again, any reliance on such a statement would have been unjustified because when the agreement was renewed in January 2007, it contained the same termination provisions: either party could terminate the agreement at the end of the contract term upon thirty days written notice for any reason whatsoever, and Tornier could terminate Addison if it failed to meet quarterly quotas. As a matter of law, Addison could not reasonably rely on a statement that is superseded by a written integrated agreement. In light of the express terms of the one-year agreement permitting termination under various circumstances, Addison Medical cannot have reasonably relied on any prior statement by Tornier that it would remain an exclusive distributor if it merely hired more employees. Also, it is not clear what damages could result from any such misrepresentation, as it seems that Addison Medical paid its employees by commission. Consequently, Plaintiffs have not carried their burden of establishing that a genuine issue of material fact exists with respect to this particular representation.

Tornier also seeks summary judgment as to Plaintiffs' misrepresentation claims regarding the alleged statement that Tornier would set attainable quotas. The Court agrees that this claim must also be dismissed. When specifically asked whether Tornier ever told him that its quotas would be attainable, Wetherill admitted that no such representation had explicitly been made (Doc. 64-8, App. 287, Wetherill Depo., p. 85). There is nothing in the record to indicate that Tornier ever actually made such a representation, and the Court has already declined to read any such term as

being implied in the agreement itself. As a result, Addison has no action in tort as to this issue.[8]

Finally, the Court addresses Plaintiffs' claims that Tornier instructed Addison not to acquire non-competing products on the basis that Tornier would fill any voids in the product line and that Addison would become the exclusive distributor of the Nexa line once it was acquired. The Court finds that there is a genuine issue of material fact with respect to these two misrepresentation claims. It is undisputed that Tornier encouraged its distributors not to carry other product lines (Doc. 108-4, App. 120, Carrow Depo., p. 69). Furthermore, Addison indicates that he was regularly asked to either eliminate or avoid other product lines (*see* Doc. 107-4, Wetherill Depo., pp. 21-24, 56, 78-79). The testimony suggests that Plaintiffs were constantly under the assumption that any such acquisition could hurt their standing with Tornier, so it is implied to some extent that Addison Medical did not bother to investigate other lines as extensively as it might have otherwise done.

Similarly, the suggestion that Addison Medical would obtain the Nexa line once it was acquired further obviated the need to sell for other manufacturers. Wetherill alleges that this promise was made several times at the end of 2006 (Doc. 107-4, App. 158, pp. 22-24). In essence, Plaintiffs' claim is that Tornier's representations led them to rely on continued business such that they did not seek out other lines, which might have served as a safety net in the event of Addison Medical's termination. Accordingly, the Court finds that a genuine issue of material fact exists with

---

[8] Plaintiffs refer to the Court's prior order on Tornier's motion to dismiss pursuant to Rule 12(b)(6). There, the Court refused to dismiss this particular misrepresentation claim because the alleged statement "could plausibly have led to [Plaintiffs'] reasonable reliance, in that it believed continued renewal of the agreement offered a level of risk that justified expected rewards" (Doc. 91, p. 18). At that stage, however, the Court accepted the allegations in the complaint as true (i.e., that the representation had in fact been made). Addison Medical must now come forward with evidence to support its claims. It has failed to do so.

respect to this particular misrepresentation claim.[9]

Accordingly, the Court **GRANTS** summary judgment in favor of Tornier as to all of Addison Medical and Wetherill's negligent misrepresentation claims. Additionally, the Court GRANTS summary judgment in favor of Tornier as to all of Plaintiffs' fraudulent misrepresentation claims, ***except*** Plaintiffs' claims regarding (1) Tornier's alleged statement that Addison should not acquire other product lines because Tornier would fill any product line voids, and (2) Tornier's alleged statement that Addison would become an exclusive Nexa distributor in Iowa.

### F. Plaintiffs' Damages

Finally, Tornier argues that even if Plaintiffs prevail on their claims, they have no compensable damages. First, Tornier argues that Plaintiffs cannot collect lost profits because the Agency Agreement expressly prohibits their recovery. Obviously, this argument only pertains to Plaintiffs' damages for the breach of contract claim, as the provisions of the contract have no effect on recoverable damages for any independent tort. As a result, the Court's analysis begins by focusing on Plaintiffs' recoverable damages for breach of contract.

The Agency Agreement provides: "Upon termination of this Agreement, neither party shall be liable to the other for any loss of profits of any kind or nature sustained or arising out of such termination" (Doc. 95-2, Exh. A, ¶ 9.6). The Court noted in its previous Order (Doc. 126) that under Texas law, limitation of liability clauses are generally enforceable, so long as they are not contrary to public policy. ***Head v. U.S. Inspect DFW, Inc.*, 159 S.W.3d 731, 748 (Tex. App. 2005)**.

---

[9] However, the Court notes that this is a much closer call than it was in Boyd Medical's case, since it is clear that Addison Medical did represent a variety of other manufacturers alongside Tornier between 2003 and 2007 (*see* Doc. 107-4, App. 155-57, Wetherill Depo., pp. 12-20). For the vast majority of these, either Addison Medical or the manufacturer opted to terminate the relationship—Tornier did not require it in most cases.

The Court of Appeals of Texas has explained that this inquiry is fact-based.

> In determining whether a limitation of liability clause is unconscionable or against public policy, courts generally consider the entire atmosphere in which the agreement was made, the bargaining process the parties went through, and whether there is such a disparity in bargaining power between the parties that one party is forced to agree to the exculpatory provision.

*Mireles v. Tejas Appraisal & Inspection Co.*, 2007 WL 1826074, *1 (Tex. App. June 27, 2007) (citing *Head*, 159 S.W.3d at 748; *Pony Express Courier Corp. v. Morris*, 921 S.W.2d 817, 821 (Tex. App. 1996)). However, the mere existence of unequal bargaining power alone is not sufficient to defeat a limitation of liability provision, as it is the unfair use of that power that undermines the contract. *Grewal v. Hickenbottom*, 2003 WL 22295373, *4 (Tex. App. Oct. 8, 2003) (quoting *Holeman v. Nat'l Bus. Inst. Inc.*, 94 S.W.3d 91, 99 (Tex. App. 2001)).

The Court has already found that a fact question exists as to whether the limitation of liability clause is enforceable here (Doc. 126), and declines to disturb that ruling. In short, Plaintiffs have presented substantial evidence that each time the contract was renewed, Tornier did not negotiate and dictated the terms of the agreement. With each successive renewal, Plaintiffs claim they were pressured to drop other product lines and focus solely on Tornier, such that by 2007, the loss of Tornier was catastrophic to their distributorships. Plaintiffs also present evidence that Tornier unfairly used its stronger bargaining power to place them in a position where they completely depended on Tornier's business. Thereafter, they claim that Tornier used its bargaining position to require Plaintiffs to accept unattainable quotas. There is further evidence to support Plaintiffs' claim that the 2007 quotas were orchestrated to cause them to miss their first quarter quotas so that Tornier could terminate the Agreement. In fact, the crux of Plaintiffs' breach of contract claim is that Tornier used its superior position to set them up for failure. The Court has

already set out the facts underlying these allegations in detail and need not repeat them all. Accordingly, a fact question exists as to whether Tornier unfairly used its stronger bargaining position in such a way as to undermine the contract. Thus, Plaintiffs may have a claim for lost profits directly resulting from the alleged breach.

Nonetheless, the Court agrees that any lost profits arising from Tornier's breach of contract must be limited to the remaining term of the agreement: June 1, 2007 through December 31, 2007. Addison Medical offers no legitimate reason to extend the recovery of such damages through five years. The Court previously explained that there is no evidence in the record to support the allegation that Tornier ever promised that Addison Medical would remain a distributor for five years. On the other hand, it is undisputed that Tornier would have been permitted to terminate the agreement at the end of 2007, so long as it gave proper notice. As such, the evidence in the case only supports breach of contract damages through the remainder of the contract term.

Next, the Court turns to the issue of damages under Plaintiffs' remaining tort claims. Plaintiffs seek the recovery of certain expenses incurred during its relationship with Tornier. Many of the damages sought are clearly unavailable because, with the dismissal of Addison Medical's various tort claims, Plaintiffs can not show causation for the particular expenses it asks Tornier to pay. For instance, Addison Medical seeks the recovery of expenses incurred from hiring additional employees. But the Court has dismissed these misrepresentation claims insofar as they depend on an allegation that Tornier induced it to hire additional employees. Such expenses are not causally related to any of Plaintiffs' other tort claims.

In fact, the only remaining tort claims pertain to Tornier's alleged misrepresentations that Plaintiffs should not acquire non-competing product lines because Tornier would fill any voids in its own product line, and Tornier's alleged statement that Addison Medical would get to

-27-

exclusively distribute Nexa in Iowa. According to Addison Medical, by focusing its efforts on Tornier, it believed it would receive continued business such that it would not need to rely on other product lines. The Court has already explained that fact questions remain as to the viability of this claim, even though it is a close call. But if Addison Medical can prove a case of misrepresentation, it may be able to present a claim for damages related to any expenses it incurred in either giving up non-competing lines against its will or not pursuing alternate product lines. However, the Court notes that Addison Medical will have to establish its actual damages, which may be difficult based on the current record.[10]

None of the other requested expenses are causally related to the remaining misrepresentation claims. Accordingly, Addison Medical cannot recover damages related to the hiring of new employees, ordering marketing instruments and literature, or devoting its resources to the Tornier line (which is itself required by the contract and non-compensable).

Finally, Tornier argues that punitive damages are not available to Addison Medical because it is unable to show that Tornier acted with malice with regard to the remaining tort claim.

> Punitive damages serve as a form of punishment and to deter others from conduct which is sufficiently egregious to call for the remedy. Mere negligent conduct is not sufficient to support a claim for punitive damages. Such damages are appropriate only when actual or legal malice is shown.
> Actual malice is characterized by such factors as personal spite, hatred, or ill will. Legal malice is shown by wrongful conduct committed or continued with a willful or reckless disregard for another's rights.

*McClure v. Walgreen Co.*, **613 N.W.2d 225, 230–31 (Iowa 2000) (quotations and citations**

---

[10] It is not lost on the Court that the evidence in the record indicates that such damages may be quite small, given that Addison Medical appears to have given up or lost its distributing contracts with other vendors for reasons unrelated to pressure from Tornier.

**omitted).** At trial, Plaintiffs must prove "by a preponderance of clear, convincing, and satisfactory evidence" that punitive damages are warranted. *Id.* **at 230.**

The record before the Court makes it difficult to determine whether Plaintiffs will be able to present sufficient evidence at trial to support a finding of actual or legal malice. But the totality of the evidence surrounding Tornier's conduct could potentially convince a reasonable juror that Tornier sought to make Addison Medical dependent on its product line, without any regard for the effect that this could have on Addison Medical's viability once Tornier terminated the distributorship. In that sense, a fact question exists as to whether Tornier's conduct amounts to a willful or reckless disregard for Addison's rights. As a result, the Court declines to dismiss Plaintiffs' claims for punitive damages at this time. However, the Court emphasizes that this is a close call, and it may be an issue for resolution at the Rule 50 stage.

Thus, the Court **GRANTS** Tornier's motion for summary judgment insofar as it dismisses all of Plaintiffs' claims for damages stemming from expenses incurred in hiring new employees, ordering marketing instruments and literature, or devoting its resources to selling Tornier products. Additionally, damages stemming form the breach of contract are limited to the remaining term of the 2007 agreement. The Court **DENIES** Tornier's motion for summary judgment as to Plaintiffs' claims for damages in all other respects.

### G. Conclusion

Accordingly, the Court hereby **GRANTS IN PART AND DENIES IN PART** Tornier's motion for summary judgment as to Addison Medical and Charles Wetherill (Doc. 99). To summarize, the Court **GRANTS** summary judgment in favor of Tornier insofar as it **DISMISSES** Plaintiffs' breach of contract claims for lack of any genuine issue of material fact (1) that Tornier terminated its distributorship for motives other than Addison Medical's failure to meet

-29-

its quota and (2) that Tornier breached the exclusivity clause of the agreement. Additionally, the Courts **FINDS** that Tornier has not waived any of its termination rights under the agreement.

The Court **DISMISSES** Plaintiffs' negligent misrepresentation claims in their entirety. The Court also **DISMISSES** Plaintiffs' fraudulent misrepresentation claims ***except*** Plaintiffs' claims regarding Tornier's alleged statements that Addison should not acquire other product lines because Tornier would fill any product line voids, and that Addison would receive an exclusive distributorship for the Nexa line.

Finally, the Court **GRANTS** Tornier's motion for summary judgment insofar as it **DISMISSES** all of Plaintiffs' claims for damages stemming from expenses incurred in hiring new employees, ordering marketing instruments and literature, or devoting its resources to selling Tornier products. Additionally, damages related to the breach of contract are limited to the remainder of the contract term: June 1, 2007 through December 31, 2007. The Court **DENIES** Tornier's motion for summary judgment in all other respects.

Addison Medical and Wetherill's remaining breach of contract claims stem from its allegations (1) that Tornier intentionally established unattainable quotas so as to cause Addison Medical to miss its first quarter quota in 2007 and thereby subject Addison Medical to termination, (2) that Tornier included products in Addison Medical's first quarter quota that had only limited availability, (3) that Tornier set 2007 quotas without adequately considering certain factors as required by the Agency Manual, and (4) that Tornier failed to make reasonable efforts to support Addison Medical's first quarter sales in 2007.

Addison Medical and Wetherill's only remaining tort claims are that Tornier fraudulently misrepresented that Addison Medical should avoid other product lines and instead focus solely on selling Tornier products so as to maintain a continued business relationship with Tornier,

and that Tornier fraudulently misrepresented that Addison Medical would receive the exclusive right to distribute Nexa once it was acquired.

**IT IS SO ORDERED.**

**DATED this 18th day of June 2009.**

                                         **s/Michael J. Reagan**
                                         **MICHAEL J. REAGAN**
                                         **United States District Judge**